**WALSH CONSTRUCTION COMPANY,**
Plaintiff,

v.

**Charles A. CHURCH, District Director of
Internal Revenue for the District of
Manhattan, N. Y., Defendant.**

United States District Court
S. D. New York.

June 28, 1965.

Hawkins, Delafield & Wood, New York City, for plaintiff; E. Randolph Dale, Robert G. Desmond, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern District of New York, for defendant; Harvey R. Blau and Laurence Vogel, Asst. U. S. Attys., of counsel.

LEVET, District Judge.

This is a tax refund suit in which the plaintiff, Walsh Construction Company ("Walsh") seeks to recover $40,646.65 plus interest which it paid to the defendant pursuant to a determination by the Commissioner of Internal Revenue of a tax deficiency for the years 1950, 1951 and 1952.

The principal issues are whether plaintiff is entitled to:

1. An 85% intercorporate dividend deduction on certain dividends received

by it from another corporation known as Allstates Constructors, Inc. ("Allstates") during the years 1950, 1951 and 1952;

2. Claim income from certain construction jobs as capital gains to itself;

3. Deduct monies paid over by it to certain so-called "investors."

The case was tried to the court without a jury. After hearing the testimony of the parties, examining the exhibits, the pleadings, the stipulations of counsel, the briefs and proposed findings of fact and conclusions of law, this court makes the following Findings of Fact and Conclusions of Law: [1]

1. Plaintiff is a corporation which was organized under the laws of the State of Iowa and has its principal place of business in the Borough of Manhattan, City of New York. (4–5)

2. Since 1899, plaintiff has engaged in the heavy construction business throughout the United States and has frequently engaged jointly with other construction firms in carrying out extensive projects requiring large investments of capital. (5)

3. The plaintiff during the years 1950, 1951 and 1952 was a closely held corporation whose stock was held by a small group of shareholders made up mostly of the Walsh and Durkin families. (Exs. B and C, Q & A 1C)

4. At various dates hereinafter mentioned, plaintiff and other contractors entered into certain agreements as joint venturers:

(a) On November 14, 1947, plaintiff and various other contractors entered into a contract as joint venturers, under the name Perini-Maney-Walsh-Rugo Construction Companies, with the Commonwealth of Massachusetts, Metropolitan District Commission, for the construction of certain tunnels in Newtown, Boston, Weston and Brookline, Massachusetts ("Boston Tunnel Project"). (Stipulation, 6)

(b) On November 25, 1947, plaintiff and another contractor entered into a contract with the City of New York, Board of Water Supply for certain work to be done in connection with the Downsville Dam in the Town of Colchester, Delaware County, New York ("Downsville Dam Project"). The agreement was performed by the contractors as joint venturers under the name Walsh Construction Company and B. Perini & Sons, Inc. Walsh had a 60% interest in the joint venture. (Stipulation, 6)

(c) On April 21, 1948, plaintiff and various other contractors entered into a contract with the United States Government for certain work to be done in connection with the Hungry Horse Dam in Montana ("Hungry Horse Dam Project"). The agreement was performed by the contractors as joint venturers under the name of General Construction and Shea and Morrison Knudsen Company, Inc. Plaintiff had a 10% interest in this joint venture. (Stipulation, 7)

(d) On November 14, 1947, plaintiff and several other construction contractors organized Allstates Constructors, Inc., a Delaware corporation, for the purpose of building the Clark Hill Dam on the Savannah River ("Clark Hill Dam Project"). (Stipulation, 6)

5. On or about November 20, 1947, plaintiff and various other construction companies which had formed Allstates entered into a stockholders' agreement (Ex. A) providing in substance:

(a) Allstates shall have 30,000 shares of capital stock with a par value of $100, aggregating $3,000,000 of capital, of which Walsh was to have 35% and the other companies certain other proportions;

(b) If Allstates is not awarded the contract for the Clark Hill Dam Project, the stockholders' agreement would be null and void;

(c) If Allstates received the contract for the Clark Hill Dam Project,

[1]. Numbers in parentheses following the Findings of Fact refer to pages in the trial transcript. "Q & A" refers to "question and answer."

the stockholders each agreed to pay in cash to Allstates ⅓ of the capital stock they had subscribed and pledged;

(d) That as more capital or working funds are required by Allstates, each of the shareholders would be required to pay additional cash and receive additional shares of capital stock at the par value of $100 a share in the same proportion as originally subscribed.

6. Pursuant to the Allstates stockholders' agreement, Walsh made three contributions totalling $700,000 on and before May 4, 1948. (Ex. 32)

7. In May and early June 1948, Walsh negotiated with certain of its employee-officers, offering to sell 20% of its interest in the four projects. (Exs. H, I, J, K)

8. Between June 1, 1948 and July 26, 1948, plaintiff entered into substantially identical agreements with certain of its employee-officers and members of their families, to wit:

| Date of Contract | Name of Investor and Relationship to Plaintiff |
|---|---|
| June 1, 1948 | F. B. Smith, New York, N. Y. — Asst. Secretary-Treasurer |
| June 1, 1948 | Mrs. L. G. Smith, New York, N. Y. — Wife of F. B. Smith |
| June 2, 1948 | J. S. MacDonald, Scarsdale, N. Y. — Vice President |
| June 30, 1948 | H. H. Dugan, Toledo, Ohio — Vice President |
| June 30, 1948 | J. J. Walsh, Mamaroneck, N. Y. — Employee |
| July 8, 1948 | C. H. Young, Davenport, Iowa — Vice President |
| July 15, 1948 | J. H. Gill, Burlingame, California — Vice President |
| July 15, 1948 | Mrs. N. P. Gill, Burlingame, California — Wife of J. H. Gill |
| July 15, 1948 | R. P. Gill, Burlingame, California — Son of J. H. Gill |
| July 15, 1948 | S. E. Gill, by N. P. Gill, trustee, Burlingame, California — Daughter of J. H. Gill |
| July 26, 1948 | Mrs. M. G. Ellis, Greenwich, Conn. — Daughter of J. H. Gill |

——◆——

(7, 8; Exs. 1–11)

Walsh had invested $1,921,250 in the four projects prior to this time. (Ex. 32)

9. H. H. Dugan, vice president and investor, borrowed money from Walsh to finance his investments with Walsh. (Exs. 1–11, H, I, J, BL, B and C, Q & A 4, 5)

10. These agreements entered into between plaintiff and the said investors recited in substance that Walsh is a contractor and one of the joint venturers in the following construction projects:

(a) Downsville Dam Project in which Walsh's percentage of participation in the joint venture was 60%;

(b) Boston Tunnel Project in which Walsh's percentage of participation in the joint venture was 27½%;

(c) Hungry Horse Dam Project in which Walsh's percentage of participation in the joint venture was 10%;

(d) Clark Hill Dam Project in which Walsh's percentage of participation in the contracting corporation was 35%.

They further provided in part:

"WHEREAS, Walsh desires to secure moneys to cover in part working capital provided by it or which it may hereafter be required to provide and also its subscriptions to capital of Allstates in connection with the foregoing projects; and

"WHEREAS, the Investor desires by providing moneys to cover a part of Walsh's investment in such projects to acquire an interest in the net avails of Walsh's participation in the projects referred to in the preceding Whereas Clauses subject to obligation to reimburse Walsh for losses as hereinafter provided and Walsh is willing to permit the Investor, in consideration of his providing funds as hereinafter provided to be used by it as part of the working capital for such projects, to acquire such an interest upon the terms and conditions hereinafter set forth, such interest allocated to said projects being hereinafter separately referred to as an 'investment' or 'participation.'"

11. With reference to the agreement between Investor H. H. Dugan and plaintiff, the agreement provided:

"Walsh hereby acknowledges the receipt of $38,425.00 from the Investor for and hereby grants to the Investor a participation in the net profits Walsh may receive from the aforesaid projects in the amount of 2%. Said sum of $38,425.00 represents 2% of the capital investment made by Walsh as of the date of this agreement in said projects and is allocated as follows:

| Name of Project | Capital Investment of Walsh to Date | Investor's interest in Walsh's Capital Investment | |
|---|---|---|---|
| (a) Downsville Dam | $600,000.00 | 2% | $12,000.00 |
| (b) Boston Tunnel | 371,250.00 | 2% | 7,425.00 |
| (c) Hungry Horse Dam | 250,000.00 | 2% | 5,000.00 |
| (d) Clark Hill Dam | 700,000.00 | 2% | 14,000.00" |

The other investors contributed varying percentages of the capital required on the four projects. The total of the contributions and shares of participation of the investors was 20%. The initial contributions of the investors totalled $384,250, twenty per cent of the investment by Walsh at that time of $1,921,250.

12. The agreements between the plaintiff and the investors also provided that:

(a) From time to time as Walsh made further capital investments with respect to any of the said four projects, the investor upon demand shall make payment to Walsh for his proportionate share of any such additional capital investment (Exs. 1–11, para. 2);

(b) In the event plaintiff incurred or paid any loss by reason of its interest in any one or more of said projects, the investors were each responsible for their specified share which was the same as their share in capital contributions and profits, i. e., 2% for H. H. Dugan. The part of each investor's investment allocated to the project concerning which a loss was incurred was to be applied against the loss and if this amount was not sufficient to meet his share of the total loss incurred by plaintiff in connection with the project, he was required to pay to plaintiff such additional sums as

would be needed in order to fully discharge his obligation (Exs. 1–11, para. 3);

(c) If an investor failed to make a required payment on account of losses, Walsh had the right to ultilize funds of the investor allocated to other projects causing a corresponding reduction in the investor's share of profits or funds which the investor would be entitled to receive pursuant to the agreement. (Exs. 1–11, para. 5)

(d) When Walsh received money on account of its share of profits, return of working capital or by reason of stock interest in any of the four projects, it was required to promptly pay to the investors their shares of such profits and such proportion of their investment as the amount of working capital or return on stock bore to total working capital for all stock interest in any such project. In the case of Allstates, profits were to be construed to mean dividends. (Exs. 1–11, para. 4)

(e) It was stated that "nothing in this agreement shall be construed to give the investor any rights, legal or equitable or beneficial, in any joint venture or in the stock of Allstates or give the investor any say or voice in the management of the projects or any rights whatsoever with respect thereto." (Exs. 1–11, para. 6)

(f) "Nothing herein shall be construed to constitute the Investor and Walsh partners or associates or to constitute them joint venturers in any respect whatsoever." (Exs. 1–11, para. 6)

(g) Any and all determinations, including determination of profit, need for additional investment, loss or any other matter were to be made by Walsh in its sole and uncontrolled discretion. Exs. 1–11, para. 6)

13. Pursuant to the aforesaid agreements between Walsh and the investors, plaintiff maintained separate ledger accounts for each of the investors with respect to the projects mentioned. (Ex. 31E; 180–182) These ledger sheets were maintained in a section of the Walsh asset and liability ledger called "Assets" and in a subsection thereof called "Investors in Joint Ventures." (180–182) The ledger accounts maintained by Walsh in respect to its investments in the various projects were also maintained in the "Investment in Joint Ventures" subsection. (181–182) The ledger sheets maintained for each of the said investors indicate that each time Walsh received a return of capital or distribution of income from any one of the four aforementioned construction projects, the agreed-upon proportionate share was debited to each investor's account and was paid by Walsh to him. Each time Walsh was called upon to make a capital contribution to another of the projects, the investor put up his principal share of that increase in capital and the investor's ledger account was credited by Walsh with that additional investment. (Exs. 31A–E)

14. In 1948 and 1949, Walsh invested certain sums in Allstates and received stock in Allstates pursuant to the stockholders' agreement. Walsh demanded and received corresponding capital contributions by the investors in the agreed-upon shares of the amount Walsh advanced or was to advance to Allstates. (Exs. 32A, 1–11, D, A, F, L, Q, R, S, T, U; 59–67)

15. Additional capital investments [1] were also made by Walsh in 1948 and 1949 in the Downsville Dam Project (Exs. 31B, D, L, Q–U), the Hungry Horse Dam Project (Exs. 31D, E, G) and the Boston Tunnel Project (Ex. F). In each instance Walsh received the agreed-upon proportion of its new investment from the investors. (Ex. 31E)

16. After the signing of the agreements with the investors, plaintiff made seven additional contributions to the capital of the four projects totalling $861,250. (Exs. 31A–D) The investors contributed 20% of this sum or $172,250. (Ex. 31E)

1. Both parties refer to these investments as "capital" contributions.

17. Walsh's demands for capital from the investors were made before it correspondingly increased its own investment in a particular project on three occasions. (Exs. D, G, 31A, 31D) The bulk of the money received from the investors was paid to Walsh after its own corresponding investments had been made. (Exs. 31A–E)

18. Walsh received various dividends and returns of capital payments in 1950, 1951 and 1952 from Allstates and made distributions of portions in accordance with the investors' agreements. (Exs. AA–AD, AY, AZ, BC, BG, BH–BJ, 31A–E)

19. Walsh received distributions of income and partial returns of capital in 1948, 1949, 1950, 1951 and 1952 on the Downsville Dam Project, the Hungry Horse Dam Project, the Boston Tunnel Project and made corresponding distributions to each investor of his agreed-upon share. (Downsville Dam Project: Exs. AE–L, AP, AR, AU, 31B, 31E, Hungry Horse Dam Project: AM, AP, AV–AX, BD–BF, 31D, 31E; Boston Tunnel Project: AN, AO, AS–AU, BA, BB, 31C, 31E)

20. Each of the investors in the four projects who were employed by Walsh were key officers: (146–147)

(a) F. B. Smith was an assistant-secretary and treasurer and a member of the Board of Directors of plaintiff. (146; Exs. B, C, Q & A 2(b)) He was also secretary of Allstates (57; Ex. CC) Mr. Smith's duties included supervising the accounting of Allstates at its office in Atlanta, Georgia. (152–155)

(b) H. H. Dugan, as vice-president of the plaintiff, was in charge of specific construction projects. (146; Exs. B, C, Q & A 2(b))

(c) J. J. Walsh, nephew of T. J. Walsh (Chairman of the Board of Directors), was one of the principal people involved in the management of the business. (149)

(d) J. H. Gill, vice-president and general manager of Walsh, was in charge of West Coast construction projects. (146)

(e) J. S. McDonald, vice-president, was in charge of specific construction projects. (147)

(f) C. H. Young, vice-president, was in charge of specific construction projects. (147)

21. During the participation of Walsh in these projects, its officers, including the officer-investors, from time to time discussed Walsh's business, including the four construction projects. (153–155)

22. On its 1950, 1951 and 1952 corporate income tax returns, the plaintiff—

(a) reported as income all those dividends received by it from Allstates— $350,000, $87,500 and $87,500 respectively (Exs. 12, 13, 14; Stipulated Facts, Schedule A);

(b) plaintiff deducted as an intercorporate dividend credit an amount equal to 85% of the total dividends received from Allstates—$297,500, $74,375 and $74,375 respectively (Exs. 12, 13, 14; Stipulated Facts, Schedule A);

(c) Walsh then took as an ordinary deduction 20% of the dividends it had received from Allstates which were due, owing and paid to the investors pursuant to the investors' agreements—$70,000, $17,500 and $17,500 respectively (Exs. 12, 13, 14; Stipulated Facts, Schedule A);

(d) Walsh received from the Hungry Horse Dam, Downsville Dam and Boston Tunnel Projects long-term capital gains in the years 1950, 1951 and 1952, in the amount of $612.86, $5,952.28, $869.44 and reported them as such (Stipulated Facts, Schedule B);

(e) Walsh took an ordinary deduction in the amount of 20% of the above long-term capital gains representing the proportion passed on to the investors (Stipulated Facts, Schedule B).

23. Corporate income tax returns (Form 1120) were filed for Allstates and tax was paid on its income; partnership

returns (Form 1065) were filed for the other three of the four projects. Plaintiff and the investors did not file partnership returns. (Stipulation, 9)

24. Upon audit of plaintiff's 1950, 1951 and 1952 income tax returns:

(a) It was determined by the Internal Revenue Service that plaintiff and the investors were joint venturers;

(b) It was determined that 20% of plaintiff's profit from the four construction projects was income to the investors and not income to plaintiff;

(c) Plaintiff's dividends received credit was disallowed to the extent of 20% of the Allstates dividends received by it;

(d) Plaintiff's net long-term capital gains income from the construction projects was reduced by an amount equal to 20% thereof;

(e) Plaintiff's deduction for the payments made by it to the investors was disallowed to the extent of the aforesaid 20% of plaintiff's share of the net long-term capital gains. (Stipulation, 9–10)

25. The aforesaid adjustments resulted in a net increase in plaintiff's income taxes for the years 1950, 1951 and 1952 in the sum of $40,646.65. (Stipulation, 10)

26. In December, 1959 and June, 1960, plaintiff filed timely claims for refund of the aforesaid $40,646.65 on the ground that it and the investors were not joint venturers and that the adjustments with respect to the dividends received credit relating to the Allstates dividends and the adjustments with respect to the long-term capital gains were erroneous and improper. The claims for refund were thereafter disallowed in full. (Stipulation, 11)

## EAST DELAWARE AND CANADIAN AMERICAN PROJECTS

27. Walsh was also a 50% joint venturer with B. Perini & Sons, Inc. in the Walsh-Perini East Delaware Tunnel Project ("East Delaware Project"). (123; Exs. BM–BS)

28. In April and May of 1950, Walsh entered into agreements with officers and members of their families with regard to the East Delaware Project, substantially identical to the agreements Walsh had entered into with the investors in June and July of 1948 with respect to the first four construction projects. (122; Exs. 1–11, BM–BS) These agreements between Walsh and the investors provided for a sharing of the profits, losses and risks. (Exs. BM–BS)

29. The East Delaware Project sustained a loss of $1,759,634.17. Walsh, a 50% venturer, sustained one-half of that loss, $879,817.09. (Exs. B, C, Q & A 6, 7) Pursuant to the investment agreements entered into between Walsh and the investors with respect to the East Delaware Project, each investor sustained his proportionate share of the loss to Walsh. (Exs. B, C, Q & A 7D; 125, 126)

30. Walsh was also a joint venturer in a B. Perini & Sons, Inc., Walsh Construction Company, Canadian-American Contractors venture to build the Sir Adam Beck Niagara Generating Section ("Canadian-American Project"). Walsh had a 20% interest in this joint venture. (Exs. BT–BZ, CA, CB)

31. On December 1, 1951, Walsh entered into agreements with certain officers and members of their families with regard to the Canadian-American Project, substantially identical with the agreements entered into by Walsh and the investors in June and July of 1948. (Exs. 1–11, BT–BZ, CA, CB) The December 1, 1951 agreements provided that in receipt for certain moneys advanced by each of the investors, Walsh agreed to share its profits, losses and risks with the investors to the extent of 20% of its share in the Canadian-American venture. (Exs. BT–CB).

32. Walsh filed a Canadian corporate income tax return in 1952 with respect to its share of the profits of the Canadian-American Project. This return was signed by F. B. Smith, Treasurer. (Ex.

BK; 134) In this return Walsh stated in part:

"Walsh Construction Co. has a 20% interest in the joint venture B. Perini and Sons, Inc., Walsh Construction Co. and Canadian-American Contractors with operations at Niagara Falls, Ont. The joint venture was formed May 31, 1951 and the first fiscal period of the joint venture ended January 31, 1952. Financial statements of the joint venture which contain particulars of the membership, etc. are included as part of this return.

"Walsh Construction Co., by separate agreements, cedes 20% of its share in the Joint Venture, profits or losses to certain non-resident individuals as indicated elsewhere in this return. Walsh Construction Co. and the individuals associated with it have no income from sources in Canada other than the business income derived as shares of profits from the Joint Venture."

Another part of the return showed the distribution of 20% of Walsh's share in the joint venture to the investors.

## DISCUSSION

If the plaintiff engaged in a joint venture with the investors with regard to Allstates and the Downsville Dam, Boston Tunnel and Hungry Horse Projects, then of the dividends and capital gains received by Walsh from Allstates only 80% would be attributable to Walsh; 20% would be the investors'.

Under the federal tax laws, a joint venture is included in the definition of partnership in Section 3797(a) (2) of the Internal Revenue Code of 1939. The Supreme Court provided a general guide to the type of analysis required to ascertain the existence of a joint venture:

" * * * whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent —the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659 (1949).

A review of the joint venture cases discloses specific factors which are the circumstances to be taken into consideration in making the determination of "whether the partnership is real within the meaning of the federal revenue laws." Id. at 741, 69 S.Ct. at 1214.

Several central factors and several, less significant, peripheral factors emerge from the fact patterns. The sharing of profits was present in every joint venture reviewed and most of those where the issue was unsuccessfully raised. E. g., Ayrton Metal Co., Inc., 34 T.C. 464 (1960), aff'd in part and rev'd in part on other grounds, 299 F.2d 741 (2d Cir. 1962); 22 Inst.Fed. Tax. 626–627 (1964). It has been termed an essential. Sugg v. Hopkins, 11 F.2d 517, 519 (5th Cir. 1926).

Responsibility for losses was almost invariably a factor where a joint venture was found. E. g., Ayrton Metal Co., Inc., supra; J. Roland Brady, 25 T.C. 682 (1955); 22 Inst.Fed.Tax. 626–627 (1964). It was implied, although absent in the agreement, when the court found the existence of a joint venture from other factors in Haley v. Commissioner of Internal Revenue, 203 F.2d 815 (5th Cir. 1953). However, in Harry Klein, 18 T.C. 804 (1952) the apparent absence of loss-sharing did not prevent the court from finding a joint venture. Still, the absence of any obligation to bear losses has been often pointed to as indicative of a relationship other than a joint venture. Roland P. Place, 17 T.C. 199, 206 (1951), aff'd, 199 F.2d

373 (6th Cir. 1952); Elizabeth Mayer, 13 T.C.M. 391, 393 (1954).

The contribution of capital or services to the venture was a term in the agreements in all cases reviewed. E. g., Rupple v. Kuhl, 177 F.2d 823 (7th Cir. 1949); Beck Chemical Equipment Corp., 27 T.C. 840 (1957). Its importance has been noted in Haley v. Commissioner of Internal Revenue, supra, 203 F.2d at 819–820, and Sugg v. Hopkins, supra, 11 F.2d at 519. Services appear to be an acceptable substitute for capital. Jahn v. Pedrick, 229 F.2d 71, 72–73 (2nd Cir. 1956); see Harry Klein, supra. However significant this factor may be, the Supreme Court has ruled that its absence does not completely rule out the possibility of a joint venture. Commissioner of Internal Revenue v. Culbertson, supra, 337 U.S. at 744, 69 S.Ct. at 1215.

Participation in management was often present in the joint ventures reviewed, e. g., J. Roland Brady, supra; 22 Inst.Fed.Tax. 626–627 (1964). However, it has been ruled not essential to the existence of a joint venture. Levin v. Commissioner of Internal Revenue, 199 F.2d 692 (2nd Cir. 1952); Ayrton Metal Co., Inc., supra, 34 T.C. at 472.

Other factors, such as the designation "venture" by the parties, the filing of a partnership return, 22 Inst.Fed. Tax. 626–627, or the manner of bookkeeping, see Beck Chemical Equipment Corp., supra, 27 T.C. at 851, also may be considered.

The agreements between the investors and Walsh and subsequent events in relation thereto disclose many of the attributes of joint ventures: Profit and loss sharing, contributions to capital and a continuing liability for further capital as required, participation in management by certain of the investors and special bookkeeping for each investor.

The fact that the agreements expressly state that they shall not be construed as joint ventures cannot be given much weight. It is the substance of the agreement which controls and not the parties' appellation. Haley v. Commissioner of Internal Revenue, supra, 203 F.2d at 818.

Plaintiff makes three principal contentions in support of its position that the relationships between it and the investors were not joint ventures:

1. There was no agreement to join together to carry on a business or venture;

2. The investors had no voice in the management of the four projects;

3. The investors made no contribution of capital to the four construction projects, i. e., their investments followed in time the start of the projects and did not constitute the means by which Walsh made its investment.

The contention that there was no agreement to carry on a business or venture and, consequently, no joint venture, is without merit. A joint venture need not have as its function the direct participation in a business. Here, the subject of the agreement was Walsh's interest in the main venture—the four construction projects. Such "subventures" unquestionably qualify as legitimate joint ventures. Sommers v. Commissioner of Internal Revenue, 195 F.2d 680 (2nd Cir. 1952); Rupple v. Kuhl, supra; Mertens, 6 Law of Federal Income Taxation § 35.05.

The assertion that a voice in management or the rendering of essential services is necessary to a joint venture is also not valid. Rupple v. Kuhl, supra. The Second Circuit has ruled that "[t]he mere fact that * * * [a venturer] did not actively participate in the business does not preclude the possibility of a bona fide intent to form a partnership." Levin v. Commissioner of Internal Revenue, supra, 199 F.2d at 694. More specifically, the court on that occasion decided that a contribution of capital and the sharing of profits and losses would "justify" a finding of a joint venture.

In fact, the officer-investors did participate to some extent in the management of the projects. Mr. Smith did

so to a considerable extent. In so acting, their corporate and individual capacities cannot be separated. There is no evidence that the members of the officers' families who were investors had a voice in management.

Plaintiff's third contention, that failure to contribute capital at the inception of the business is fatal to a joint venture, enjoys some apparent support in several cases. In Sommers v. Commissioner of Internal Revenue, supra, 195 F.2d at 681, and Rupple v. Kuhl, supra, 177 F.2d at 826, it was regarded as indicative of a joint venture that the agreements in question occurred at or before the start of the venture. In Sommers, the court said: "[W]e cannot see any reason why there should not be a 'subventure,' so to say, between a partner and his wife or any third person, provided that it be by agreement made before or at the formation of the firm, and that the share to be received out of the firm earnings be a consideration in good faith for the use of property by means of which the partner makes his contribution to the firm assets."

It should be noted that Sommers and Rupple were cases involving subventures between a husband and wife. Insofar as the above quote refers to joint ventures other than family arrangements, it is dictum. In family cases, time of investment is a sensitive issue since there is a unique inducement in such cases to assign income among the members of the family to reduce taxes. Entry into an agreement at or near the end of a venture casts suspicion on the existence of a legitimate desire to engage in a business, whereas an early investment indicates the acceptance of the usual business risks. Transactions calculated to reallocate family income or reduce family taxes are subject to careful scrutiny. Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670 (1946); Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940).

In the Tower and Culbertson cases, supra, the Supreme Court set down the approach which must govern this case. It is entirely inconsistent with any hard and fast rule requiring investments by a joint venturer at the outset of the venture regardless of all other factors and bona fide intent to form a joint venture. The test stated in Tower, supra, 327 U.S. at 287, 66 S.Ct. at 536, and repeated in Culbertson, supra, 337 U.S. at 741–742, 69 S.Ct. at 1214 is much more flexible: "[W]hether the partners really and truly intended to join together for the purpose of carrying on the business and sharing profits and losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.' "

The time of a capital contribution is no more than one of several tests of partnership. Such tests, as noted earlier, are circumstances to be taken into consideration in determining "whether the partnership is real within the meaning of the federal revenue laws." Id. at 741, 69 S.Ct. at 1214. They are not decisive. Ibid. Certainly the single time-of-capital contribution factor is not itself conclusive.

Here the investors made their agreements after Walsh had become involved in the four projects. Walsh had invested close to $2,000,000 in these projects and anticipated further capital requirements as work progressed. To cover and provide its capital contributions to the projects, Walsh entered into the agreements. The investors together initially furnished 20% of Walsh's investment up to that time. Thereafter, Walsh was called upon to make substantial additional contributions. The investors were obligated to pay to Walsh 20% of these additional sums, and did so.

I believe that this state of facts does not preclude finding a joint venture. The investors here made their agreements well in advance of the completion of the projects and before considerable amounts of capital were to be required. They were subject to the

business risks of the four projects, including the obligation to furnish additional capital as required.

Plaintiff also points to Sugg v. Hopkins, supra, where no joint venture was found because one party to the agreement was "the sole owner of the property or capital employed therein, and of the increase or profits" as they accrued. Id., 11 F.2d at 519. In Sugg the capital employed was a herd of sheep and a ranch owned and contributed by one of two parties. Here, in contrast, the capital employed was money of which 20% was contributed by the investors and 80% by Walsh. Further, the investors here are entitled to and, in effect, own 20% of the "increase" (i. e., capital gains and dividends).

 Nor do I regard it as significant that several of Walsh's contributions to the capital of the four projects preceded corresponding payments to Walsh by the investors. The purpose of the agreements with the investors was to "cover in part working capital provided by it or which it may hereafter be required to provide and also its subscriptions to capital of Allstates in connection with the foregoing projects * * *." (Finding of Fact No. 13) This is a function no less important than furnishing the very capital paid into the projects by Walsh. The assurance that capital will be forthcoming from investors obviously frees other capital for investment. In any event, today's capital contribution to Walsh by investors may be tomorrow's capital investment by Walsh to the four projects.

After reviewing all attributes of the agreements and the surrounding circumstances, I conclude that the true intention of Walsh and the investors was to carry on joint ventures.

In view of this, the investors together were entitled to 20% of the dividends and capital gains arising out of the four projects. Walsh could not properly claim this share as income or capital gain to itself and would not be entitled to any dividend credit on it.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action under 28 U.S.C. § 1346(a)(1).

2. The agreements between Walsh and the investors concerning the four projects constituted joint ventures.

3. Walsh was not entitled to take an 85% intercorporate dividend credit on 20% of the dividends received on the Allstates stock held in its name since such dividends were the property of the investors.

4. Walsh was not entitled to include in its income 20% of the capital gains income declared on the four projects since it was attributable to the investors.

5. The deductions taken by Walsh for monies paid to the investors must be disallowed.

6. The complaint must, therefore, be dismissed on the merits with prejudice and with costs.

Settle judgment on notice.