UNIVERSITY HILL FOUNDATION, FORMERLY LOYOLA UNIVERSITY FOUNDATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 73993, 5311–65, 1482–66.    Filed January 8, 1969.

*Austin H. Peck, Jr., Dana Latham*, and *Henry J. Steinman, Jr.*, for the petition.

*Richard W. Janes* and *J. Earl Gardner*, for the respondent.

TANNENWALD, *Judge:* These consolidated proceedings involve income and excess profits taxes for the fiscal years ended April 30, 1952, through April 30, 1965, in the aggregate amount of $10,070,677.25. The principal questions in issue are whether petitioner is exempt from

Federal income tax under sections 501(c)(3) of the 1954 Code and 101(6) of the 1939 Code; whether petitioner is a "feeder organization" within the meaning of sections 502 and 101 of the 1954 and 1939 Codes, respectively; and what part, if any, of petitioner's income is taxable as "unrelated business taxable income" within the meaning of sections 511–513 of the 1954 Code and 421–422 of the 1939 Code.[1] If any of those questions are decided against petitioner, there are several remaining questions which will require consideration.

The trial of the case extended over a period of approximately 6 weeks. It was held before Tax Court Commissioner Marshall D. Davis, who prepared a lengthy report, approximately 70 pages, containing the essential details of the petitioner's purchase-and-lease transactions. The report was served on the parties and is of public record. The parties have filed certain objections to the commissioner's report, which have been given consideration in making the findings of fact herein.

### FINDINGS OF FACT

Petitioner is a California corporation. Its principal office was located at 218 North Juanita Avenue, Los Angeles, at the time its petition herein was filed. Its returns were filed with the district director of internal revenue at Los Angeles.

Petitioner, hereinafter sometimes called the foundation, was organized April 26, 1945, under the General Non-Profit Corporation Law of the State of California for the sole purpose of raising funds for Loyola University of Los Angeles. Its founders were Lorenzo M. Malone, hereinafter called Father Malone, a Catholic priest of the Jesuit Order (Society of Jesus), and Daniel G. Marshall and J. P. Carroll, prominent Catholic laymen living in Los Angeles.

Under its articles of incorporation the foundation had broad powers to conduct various charitable and educational activities, to contribute funds to other tax-exempt organizations, to engage in various fundraising business transactions such as acquiring, selling, or leasing real and personal property, and—

In general to do all things authorized to be done by the laws relating to non-profit corporations of the state of California, whether or not specifically set forth in these articles of incorporation, and to do all acts necessary or expedient for the administration of its affairs but the corporation shall not have the authority to do anything which would deprive it of exemption from federal income tax under Section 101(6) of the Internal Revenue Code.

Loyola University, hereinafter sometimes called the university, is an educational institution and at all times relevant herein has been exempt from Federal income tax under section 101(6) of the 1939

---

[1] With respect to the correlation of the 1939 and 1954 Code provisions herein, see fn. 6, *infra*.

Code and section 501(c)(3) of the 1954 Code. It was organized by the Jesuit order and has always been under its management and control. It maintains a full-time university for male students located at 7101 West 80th Street, Los Angeles, and a school of law in the downtown Los Angeles area.

The foundation's original bylaws provided for three directors, one of whom was to be nominated by the president of the university. All three of the directors were to be nominated or approved by the Jesuit Order. There has always been a close relationship and complete unanimity of interest between the foundation and the university. The university made the foundation an initial gift of $10,000 at the time of its organization.

Father Malone became associated with the university prior to 1935, after having taught for several years at St. Ignatius High School in San Francisco. His whole remaining life, until his death in 1956, was devoted principally to Loyola University and the education of young men. He was untiring in his efforts to raise funds for the financial needs and growth of the university. He served as its treasurer and director of development. He organized a number of university-supporting organizations such as an alumni association and various fund-raising guilds and he was constantly soliciting and obtaining private donations for the university.

Father Malone had been a banker before he entered the Catholic priesthood. The financial survival of Loyola University and the success of the foundation in its fund-raising operation was due largely to his extraordinary business acumen and capacity for work and his personal charm and persuasiveness. In his later years, he came to be known as the symbol, or patron saint, of Loyola University. He never received any compensation for his services to Loyola University or to the foundation. As a Jesuit priest, he was subject to the vows common to Catholic orders, of chastity, poverty, and obedience.

About 1942 Father Malone, with the help of Mildred Spencer, prepared a mailing list of about 5,000 names of Southern California businessmen from whom they began soliciting donations to the university. Mildred was a recent Catholic convert whose husband had died in 1941. After becoming acquainted with Father Malone, she volunteered to help him with his work on behalf of the university and remained associated with him until his death. She was a woman of independent means and never received any compensation for her services from Father Malone, the university, or the foundation.

The idea of forming a nonprofit corporation to raise money for Loyola University was first suggested to Father Malone by Joseph W. Drown, a successful California businessman with whom Father

Malone had become acquainted in 1942. Through Father Malone, Drown became interested in the university and made substantial contributions to it and to the foundation. He told Father Malone that he owned a valuable income-producing hotel property which he would be willing to sell to such a corporation under a plan which he thought would be helpful in raising money for the university.

After further conferences, in which Father Malone and Drown and others connected with or interested in Loyola University participated, the foundation was formed and soon thereafter purchased the hotel property.

The property was the U.S. Grant Hotel, located in downtown San Diego, Calif. It was then the largest hotel in San Diego. It was owned by H. C. Fryman Hotel Co., whose stock was all owned by Drown. The hotel was then in a prosperous condition with an annual net profit, before depreciation, of approximately $1 million. Essentially, the plan agreed upon, which will be discussed in more detail below, was for the foundation to purchase the H. C. Fryman Hotel Co. stock, dissolve the corporation, then lease the hotel properties back to the operators and pay the balance of the purchase price for the stock out of the rentals from the lessee. Under this plan it was contemplated that the tax-exempt foundation would incur no tax liability on the receipt of the rental payments, that the operating group would be able to deduct the rent as a business expense, and that the profit on the sale of the stock would be taxed to Drown at capital gains rates.

The acquisition of the U.S. Grant Hotel property was the first of a series of transactions of the same general character in which the foundation purchased the assets or the stock ownership of a going business and leased the assets back to the former operators, or others, without any disrupting change in the conduct of the business. One of the chief architects of the plan, as later developed, was Paul Cote. It came to be known as the Cote formula. Cote was a Los Angeles attorney and Catholic layman who had assisted in organizing the foundation. He had attended school with Father Malone and they had remained close friends and associates. He served as legal counsel for the foundation from its inception and as its president and a member of its board of directors from 1947 until his death in November 1956. The foundation's business affairs were conducted from his office. He received no compensation for his services to the foundation prior to 1953. From 1953 to 1956, he was paid $1,000 per month, and from July 1956 until his death, $1,500 per month, for his legal services to the foundation.

J. P. Carroll became president of the foundation in 1957 to succeed Paul Cote and has continued to serve in that capacity. He has also served as a director since the foundation's inception. Carroll is a

successful businessman and is president and a majority stockholder of J. P. Carroll Co., a large paint-contracting firm located in Los Angeles. The foundation's business affairs are conducted from his offices. He has never received directly any compensation for his services to the foundation but since 1959 the foundation has paid the J. P. Carroll Co. from $15,000 to $25,000 per year for office space and services and to compensate for the loss of time spent by Carroll on behalf of the foundation.

Following is a list of the principal properties acquired by the foundation over the period November 11, 1945, to October 31, 1954, showing the type of business, the year acquired, and the year sold:

| | Type of business | Year acquired | Year sold |
|---|---|---|---|
| U.S. Grant Hotel | Hotel | 1945 | 1950. |
| Lakeview Mfg. Co | }Manufacturing venetian blinds and lumber. | 1947 | 1960. |
| Clark County Lumber Co | | 1947 | 1955. |
| White Pine Lumber Co | Milling | 1947 | 1961. |
| Ver Halen Press | Printing | 1947 | 1959. |
| Foster Sand & Gravel Co | }Sand, gravel, and concrete | 1948 | Still owned. |
| Brea Ready Mix Concrete Co | | 1949 | Do. |
| R & G Ready Mix | | 1951 | Do. |
| Gen. Engineering & Dry Dock Co | Port facilities, etc | 1948 | 1951. |
| Pacific Island Scrap Co | Scrap collection | 1949 | 1960. |
| Allied Record Mfg. Co | }Radio programs, transcriptions, etc | 1949 | 1953. |
| Records Labs, Ltd | | 1949 | Do. |
| American Extruded Prod. Co | Manufacturing plastics | 1950 | 1956. |
| Weiser Co | Manufacturing locks, etc | 1950 | 1959. |
| Dura-Flex Co | Manufacturing plastics, foam rubber | 1951 | 1958. |
| Golden West Rubber Prod., Inc | Manufacturing rubber treads | 1951 | Still owned. |
| Ray Oil Burner Co | Manufacturing oil burners | 1951 | Do. |
| Caliquilt Furniture Corp | | 1952 | 1962. |
| Metal Windows Corp | Manufacturing metal windows | 1952 | Still owned. |
| Vulcan Foundry Co | Foundry | 1952 | Do. |
| Trinity County Timber Co | Timber and timberlands | 1952 | Do. |
| Royal Farms Dairy Co | }Dairy and dairy products | 1953 | 1957. |
| Anderson Dairy | | 1953 | 1965. |
| Rancho Grande Creamery | | 1954 | Do. |

The assets acquired included land, buildings, machinery and equipment, current assets, trade names, goodwill, etc., comprising generally all of the assets used in the going business.

The outstanding liabilities of the acquired businesses were usually assumed by the foundation. Most of the businesses were operating profitably at the time and continued to do so. Others proved unprofitable and were disposed of by the foundation, some at considerable losses. A few of them are still owned by the foundation, as shown in the above table, and are still producing income.

One of the transactions, Ver Halen Press, involved no real estate. There were other transactions (as indicated in the table below) in which the foundation acquired a leasehold interest in the property, rather than a fee interest, and subleased it to the operating lessee. In Anderson Dairy, the property purchased by the foundation and leased to the operating lessee was separated from the other assets when the lessee of its own volition moved the business to another site. The abandoned premises were then rented by the lessee to other tenants

after being remodeled at the foundation's expense. The lessee's obligation for rental payments to the foundation under the lease agreement was not affected. The parties have stipulated that for depreciation purposes the allocated bases for the different types of leased assets, covered by most of the transactions involved herein, if the foundation is held subject to income tax, are as follows:

| | Total allocated value of fixed assets | Real property | Tangible personal property | Intangible property |
|---|---|---|---|---|
| Allied Record Mfg. Co | $482,135 | $111,058 | $209,860 | $161,217 |
| Recorders Labs, Inc[1] | 147,272 | [2] 22,566 | 73,483 | 51,222 |
| American Extruded Prod. Co.[1] | 746,901 | | 136,622 | 610,280 |
| Anderson Dairy | 1,250,000 | 250,000 | 244,749 | 755,251 |
| Rancho Grade Creamery | 227,203 | 40,000 | 170,488 | 16,716 |
| Clark County Lumber Co | 233,997 | 68,034 | 97,142 | 68,822 |
| Dura-Flex Co | 25,036 | 11,425 | 13,610 | 1 |
| Foster Sand & Gravel Co | 228,512 | 41,554 | 77,937 | 109,021 |
| Brea Ready Mix [1] | 15,000 | | 12,000 | 3,000 |
| R & G Ready Mix [1] | 22,500 | | 12,355 | 10,145 |
| Golden West Rubber Prod | 2,151,570 | 50,000 | 132,000 | 1,969,570 |
| Lakeview Manufacturing Co | 1,372,500 | 117,887 | 224,225 | 1,030,388 |
| Metal Window Corp | 168,274 | 48,000 | 40,370 | 79,904 |
| Pacific Island Scrap Co. [1] | 1,500,000 | [2] 27,388 | 117,712 | 1,354,910 |
| Ray Oil Burner Co | 4,204,895 | 412,793 | 312,726 | 2,729,376 |
| Royal Farms Dairy Co. [3] | 1,558,497 | 215,500 | 427,474 | 915,523 |
| Ver Halen Press | 50,793 | | 50,793 | |
| Vulcan Foundry Co | 248,771 | 99,510 | 149,263 | |
| Weiser Co. [3] | 950,887 | 195,000 | 170,566 | 581,145 |
| White Pine Lumber Co | 6,824,534 | [4] 2,228,121 | 961,430 | 3,634,983 |

[1] These transactions involved leaseholds. Recorders Labs, Inc., and Allied Record Mfg. Co. were a single transaction, as was Foster Sand & Gravel Co., Brea Ready Mix, and R & G Ready Mix.
[2] Represents the value of leasehold improvements.
[3] In addition to the above-listed assets were plants of Ray Oil Burner Co. valued at $750,000 and of Weiser Co. valued at $4,175.33.
[4] This figure includes $966,500 paid for stumpage in Modoc National Forest.

In most instances, a new corporation was formed to operate the business under lease from the foundation. The new companies usually had a comparatively small equity capitalization. Former owners and key employees who were to continue with the business acquired interests in some of the operating companies. The former owners were limited to a minority interest of not more than 48 percent. While the leases remained in force, the majority interest in the lessees was required to be held by persons approved in writing by the foundation.

Prior to the enactment of the unrelated business taxable income and business lease provisions of the 1950 Revenue Act, the terms of the lease usually exceeded 5 years and some carried renewal options. Thereafter new leases were limited to a term of not more than 5 years with no renewal options, and the existing leases were so amended.

The lessees usually agreed to pay the foundation rentals of 80 percent of the defined net profits of the business, sometimes reduced to 60 percent after total payments had reached a specified amount, and the foundation agreed to pay to the former owners on the purchase price a percentage of the rentals received, from the lessee, usually 90 percent,

plus the proceeds from the sale of any capital assets. In determining net profits the lessees were limited to the payment of reasonable salaries and bonuses to their employees. Any assets found not to be needed in the operation of the businesses were withdrawn from the leased properties and sold or otherwise disposed of by the foundation. The following table shows petitioner's gains and losses from the sale of assets over the 1952–65 period:

| Petitioner's FYE Apr. 30— | Sec. 117(j) or sec. 1231 gains (losses) | Short-term capital gain (losses) | Long-term capital gain (losses) |
|---|---|---|---|
| 1952 | $318 | 0 | 0 |
| 1953 | (39,506) | $83,500 | ($184,026) |
| 1954 | 11 | 82,840 | 17,499 |
| 1955 | (17,598) | 87,193 | 1,776 |
| 1956 | (264,307) | 81,684 | 3,139 |
| 1957 | 8,060 | 96,165 | 1,869 |
| 1958 | (212,539) | 2,500 | (537,773) |
| 1959 | (281,143) | 23,266 | 1,776 |
| 1960 | 123,072 | 20,131 | (526,560) |
| 1961 | 24,150 | 18,146 | 1,957 |
| 1962 | 1,853 | 14,190 | 1,776 |
| 1963 | 0 | 16,976 | 1,776 |
| 1964 | 7,072 | 15,164 | 1,776 |
| 1965 | (448,023) | 15,903 | (488,524) |
| Total | (1,098,580) | 557,657 | (1,703,538) |

There was no correlation between the cost or value of the fixed assets acquired by the foundation and the rentals paid by the lessees. As shown by the table at page 553, *supra*, the proportionate values of real and personal property, where the leased assets consisted of both, differed widely according to the characteristics of each business. Intangible assets generated a substantial portion of the foundation's income from the leased properties.

The current assets acquired by the foundation in the purchase of the businesses were usually sold to the lessees at full value in return for their promissory notes. Such notes were received by the foundation over the 1947–54 period in the aggregate amount of $4,473,577.69. At the close of the foundation's fiscal year, ended April 30, 1965, there were only two unpaid notes with a principal balance due of $603,979.79 and unpaid interest in the amount of $171,598.58.

All of the lease agreements purported to establish a strict lessor-lessee relationship between the foundation and its lessees and conformed, in most respects, to the usual lease pattern. The lessees had the right to exclusive use of the assets for the term of the lease. Neither the foundation nor any of its officers or directors took any active part in the actual day-to-day operation of the businesses. Business management was left to the lessees. The foundation reserved the right to inspect the premises and the books and records of the lessees and also the right of approval of any assignee of the lessee.

The leases were essentially "net" leases. The lessees were required to pay the taxes and costs of insurance and to maintain the premises and assets in good state of repair at their own expense. The cost of any capital improvements, up to a limited amount, or any others authorized by the foundation, might be deducted from the rental payments due the foundation and then become the property of the foundation. Non-capitalized cost of improvements were to be charged as an expense in computing the net income of the business. Over the period of the foundation's ownership of the properties involved, over $7 million of additional capital assets were acquired by the lessees, most of which was offset against rentals. The cost of the capital assets acquired was commensurate with the depreciation chargeable on the leased assets.

None of the sellers of the assets acquired by the foundation were officers or directors of the foundation and no officer or director of the foundation had any proprietary interest in any of the businesses or assets acquired by the foundation.

In several instances, the lessee companies sold shares of their stock, or partnership interests, to Paul Cote's wife or his two minor children or to Father Malone's secretary or her nephew. In each instance the shares (interests) were paid for by the person to whom they were issued in the same proportionate amount as was paid by other participants. The interests were minor.

Generally the foundation was required to make purchase-money payments only out of the rentals received, with the shares acquired by the foundation and/or the underlying assets being pledged as security for payment. As a result, the foundation generally had no personal liability for the unpaid purchase price. The lessees were obligated to pay rentals to the foundation only out of net profits. In a few instances, minimum payments and minimum rentals were required, regardless of profits. However, the lessees were not unconditionally liable to pay such minimum rentals but their failure to do so gave the foundation the right to cancel the lease. Other than through the receipt of rentals, or its failure to receive rentals, the foundation did not share in the operating profits or losses. The lessee agreed to exert its best efforts to produce the highest possible net profits consistent with good judgment and sound business practices. The salaries and bonuses payable to the lessees' officers and employees were limited to fair and reasonable amounts and in some instances limitations were prescribed in the lease agreements. It was generally understood that the foundation reserved the right to repossess assets not required in the operation of the business and there was a specific reservation of that right in some of the leases. The following table shows the net cash financial result to the

foundation at December 30, 1965, in each of the above-listed Cote formula transactions:

| | Purchase price | Down-payment | Cash expended | Cash received | Cash gain or (loss) |
|---|---|---|---|---|---|
| 1. U. S. Grant Hotel | $2,881,365 | $300,000 | $3,843,432 | $4,028,799 | $185,367 |
| 2. Lakeview Mfg. Co | 1,300,000 | 30,000 | 1,203,559 | 1,193,867 | (9,692) |
| 3. Clark County Lumber Co | 310,000 | 50,000 | 299,575 | 287,839 | 8,264 |
| 4. White Pine Lumber Co | 7,000,000 | 250,000 | 2,524,659 | 2,952,553 | 427,894 |
| 5. Ver Halen Press | 57,908 | 10,000 | 86,816 | 62,902 | (23,914) |
| 6. Foster Sand & Gravel Co | 228,512 | 15,000 } | | | |
|    Brea Ready Mix Concrete Co | 15,000 | 3,500 } 1,313,077 | 3,042,383 | 1,729,306 | |
|    R & G Ready Mix | 22,500 | 7,500 } | | | |
| 7. Gen. Engineering & Dry Dock Co | 2,200,000 | 100,000 | 600,871 | 521,741 | (79,131) |
| 8. Pacific Island Scrap Co | 2,000,000 | 100,000 | 2,019,668 | 2,662,842 | 643,173 |
| 9. Allied Record Mfg. Co | 700,000 } | None | 841,976 | 1,209,844 | 367,868 |
|    Records Labs, Ltd | 100,000 } | | | | |
| 10. American Extruded Products Co | 820,000 | 1,000 | 801,900 | 871,584 | 69,684 |
| 11. Weiser Co | 990,000 | 5,000 | 1,377,136 | 1,821,615 | 444,479 |
| 12. Dura-Flex Co | 17,736 | 3,500 | 305,836 | 71,187 | (234,650) |
| 13. Golden West Rubber Prod., Inc | 2,720,299 | 100,000 | 2,756,700 | 2,492,403 | (264,297) |
| 14. James-Pond-Clark | 75,000 | ¹ 56,710 | 75,000 | 601,251 | 526,251 |
| 15. Ray Oil Burner Co | 5,000,000 | 10,000 | 5,717,045 | 6,457,904 | 740,886 |
| 16. Caliquilt Furniture Corp | 250,000 | 70,000 | 699,213 | 260,929 | (438,284) |
| 17. Metal Windows Corp | 275,000 | 10,000 | 362,754 | 616,883 | 254,129 |
| 18. Vulcan Foundry Co | 550,000 | 10,000 | 360,299 | 589,199 | 228,900 |
| 19. Trinity County Timber Co | 2,997,000 | 202,500 | 4,509,935 | 5,301,560 | 791,625 |
| 20. Royal Farms Dairy Co | 2,680,000 | 10,000 | 1,409,566 | 1,773,484 | 363,918 |
| 21. Anderson Dairy | 1,250,000 } | 22,500 | 1,724,758 | 2,076,571 | 351,813 |
|    Rancho Grande Creamery | 350,000 } | | | | |

¹ This amount had already been advanced by the foundation as working capital and was credited against the purchase price.

The Rancho Grande Creamery acquisition was the last of the Cote transactions and was concluded in 1954.

Each of the foundation's above-described acquisitions had an origin similar to that of the U.S. Grant Hotel. Generally, the opportunity for the investment was brought to the attention of Father Malone or Paul Cote by their friends or business acquaintances, some of whom had previously made donations to the foundation or the university. In some instances, the approach was through professional brokers who had learned of the foundation's activities along that line. Father Malone usually made the final decision.

In each transaction, there was a bona fide arm's-length negotiation between representatives of the foundation and the sellers and the purchase price arrived at was considered fair and reasonable by both parties. The parties herein have stipulated that in all instances the purchase prices were reasonably commensurate with the fair market value of the properties acquired.

In addition to the purchase and lease of going businesses under the Cote formula as described above, the foundation acquired other income-producing properties of various types, including the following:

Motion picture royalty rights purchased in 1951 at a cost of $2,500; still owned by the Foundation; royalties received to April 30, 1965, $125,345.04.

Office building located in San Francisco purchased in 1952 for $850,000; building only sold in 1960 for $274,170; land with probable value of approximately $500,000 still owned by Foundation.

Office building in Los Angeles purchased in 1949 for $840,000; sold in 1958 for $85,000 plus assumption of mortgage of $427,500; portion of Foundation's cost recovered by donation from original owners.

Residential property near Loyola University purchased May 11, 1951, for $9,000; sold in 1957 for $8,000.

Malibu Beach residential estate purchased September 1954 for $100,000; annual payments on purchase price donated by former owners; property conveyed to Loyola University in 1956.

Over the 1950–52 period, the foundation entered into annuity contracts with five aged individuals under which the individuals made contributions of varying amounts to the foundation and the foundation promised to pay them certain annuities each month for a fixed period or for life. At the end of its fiscal year ended April 30, 1965, the foundation had a net gain on the contracts of $156,692.37. The foundation still owns certain stock transferred to it by one of the individuals which it carries in its books at $52,000, its agreed value in 1952. The present value of the stock is in excess of that amount. It had produced dividends as of April 30, 1965, in excess of $21,000. The annuitant, now 82 years of age, receives $300 per month from the foundation. The amount of each annuity which the foundation agreed to pay was reasonable in relation to the value of the property received in exchange therefor.

Since its inception and through the year ended April 30, 1965, the foundation has made contributions to Loyola University as follows:

| FYE Apr. 30— | Amount of contribution | FYE Apr. 30— | Amount of contribution |
|---|---|---|---|
| 1948 | $73,000.00 | 1958 | $42,557.83 |
| 1949 | 48,446.17 | 1959 | 63,754.22 |
| 1950 | 85,675.97 | 1960 | 21,335.71 |
| 1951 | 3,000.65 | 1961 | 63,928.22 |
| 1952 | 8,400.00 | 1962 | 62,000.00 |
| 1953 | 191,500.07 | 1963 | 62,813.54 |
| 1954 | 64,584.08 | 1964 | 62,218.40 |
| 1955 | 385,920.06 | 1965 | 68,096.80 |
| 1956 | 832,826.48 | | |
| 1957 | 54,108.79 | Total | 2,194,166.99 |

The only other distribution by the foundation was a donation to Loyola High School, another nonprofit organization under the jurisdiction of the Jesuit order.

The reduction in the contributions to the university after 1956 was on the advice of its counsel, pending settlement of the within tax dispute. It is the foundation's intention to distribute at least $4 million of its accumulated funds to the university if and when the present controversy is settled favorably. A resolution to that effect was adopted by the foundation's board of directors held March 29, 1966.

The following table shows the foundation's cash position at the end of each year of its existence:

| Year ended Apr. 30— | Cash balance | Year ended Apr. 30— | Cash balance | Year ended Apr. 30— | Cash balance |
|---|---|---|---|---|---|
| 1945 | $115,400.00 | 1952 | $561,680.72 | 1959 | $949,133.97 |
| 1946 | 74,674.88 | 1953 | 341,400.20 | 1960 | 1,059,975.32 |
| 1947 | 50,023.46 | 1954 | 490,572.70 | 1961 | 1,983,703.59 |
| 1948 | 88,836.33 | 1955 | 502,554.66 | 1962 | 2,167,350.57 |
| 1949 | 75,877.86 | 1956 | 586,184.96 | 1963 | 2,711,262.98 |
| 1950 | 79,355.85 | 1957 | 597,462.60 | 1964 | 3,353,777.51 |
| 1951 | 286,280.67 | 1958 | 893,644.07 | 1965 | 4,224,310.25 |

Of the $4,224,310.25 total in 1965, $249,952.15 was on deposit in commercial banks, $3,474,358.10 was in savings accounts and certificates of deposits, and $500,000 was on deposit with the Internal Revenue Service.

Soon after its organization the foundation filed with the Commissioner an application for income tax exemption, which was granted on a temporary basis on June 15, 1945. A final tax ruling was issued by the Commissioner on November 19, 1946, and continued in effect until revoked by the Commissioner April 4, 1956. The letter of revocation summarized the methods of operations of the foundation, already set forth in these findings of fact and went on to state:

In order to be entitled to exemption under section 101(6) of the 1939 Code, or section 501(c)(3) of the 1954 Code, an organization must be both organized and operated exclusively for one or more of the purposes stated therein.

Further, certain organizations described in such sections of the law shall be denied exemption for the taxable year if the amounts accumulated out of income during the taxable year or any prior year and not actually paid out by the end of the year are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose or function constituting the basis for exemption under section 501(c)(3) or 101(6). (Section 504 of the 1954 Code corresponding to section 3814 of the 1939 Code.)

It is the opinion of this office that by engaging in the transactions referred to above that you have not been engaged exclusively in educational or charitable activities. In comparison with the business transaction engaged in and the financial operations attendant thereto, your funds and activities attributable to your educational or charitable undertakings are nominal. It is apparent that your primary activities and principal expenditures are concerned with your business ventures and that your exempt activities are incidental.

It is the further opinion of this office, that in addition to not being operated exclusively for exempt purposes, you are precluded from exemption by reason of section 504 of the Code. As stated above, at April 30, 1954 you were indebted to the extent of approximately nineteen and one-half million dollars. We have concluded that the amount of income used to liquidate such indebtedness is an unreasonable accumulation within the meaning of section 504.

Accordingly, it is held that beginning with the fiscal year ended April 30, 1952 and for subsequent fiscal years you are not entitled to exemption from Federal income tax. Our ruling of November 19, 1946 is modified in accordance herewith. You are required, therefore, to file income tax returns on Form 1120 for the fiscal year ended April 30, 1952 and subsequent fiscal years with the District

Director of Internal Revenue at Los Angeles, California, who is being advised of this action.

Pursuant to the Commissioner's instruction, the foundation filed returns on Form 1120 for each of the fiscal years ended April 30, 1952, to April 30, 1965, inclusive, although it continued to assert its claim for tax-exempt status. In due course, deficiency notices for all of such years were sent to the foundation and the petitions herein were filed. The following table shows for each year the net income reported by the foundation, the income determined in the deficiency notices, and the amount of income as revised by the foundation in its petitions:

| Year ended— | Per returns | Per notices | Per petitions |
|---|---|---|---|
| 4/30/52 | $948,561.29 | $2,051,496.45 | $1,020,567.18 |
| 4/30/53 | 1,224,802.29 | 2,592,660.96 | 1,102,611.56 |
| 4/30/54 | (907,238.39) | 1,770,850.51 | (589,820.76) |
| 4/30/55 | 1,007,670.07 | 2,501,813.08 | 1,579,258.07 |
| 4/30/56 | (194,359.12) | 2,102,859.01 | 786,591.17 |
| 4/30/57 | 251,926.13 | 1,891,267.10 | 194,628.76 |
| 4/30/58 | (240,768.93) | 770,568.92 | 184,952.85 |
| 4/30/59 | 474,289.85 | 747,113.97 | 489,761.66 |
| 4/30/60 | (381,839.00) | 1,208,432.79 | (321,285.12) |
| 4/30/61 | 409,689.44 | 735,186.69 | 441,318.00 |
| 4/30/62 | 445,224.38 | 738,235.53 | 435,614.16 |
| 4/30/63 | 417,986.32 | 744,572.65 | 420,180.17 |
| 4/30/64 | 377,177.76 | 660,777.82 | 357,535.78 |
| 4/30/65 | (440,488.11) | 516,399.40 | 468,467.60 |
| Totals | 3,392,633.98 | 19,032,224.88 | 6,570,381.08 |

The respondent also determined excess profits net income of $2,051,-429.58 for 1952, $2,625,644.44 for 1953, and $1,861,481.99 for 1954.

In these proceedings the parties have stipulated facts pertaining to the different aspects of the computation of net income, such as depreciation and allowable deductions, which would largely control the computation of the foundation's net income for all years involved.

### OPINION

The purchase- and lease-type of transaction which gives rise to the within litigation was the product of a plan constructed by Paul Cote and has often been described as the Cote formula.[2] Under this plan, all of the shares of a corporation, engaged in active business operations, were purchased by petitioner against a small downpayment and an agreement to pay the balance of the agreed purchase price through the remittance by petitioner of 90 percent of the amounts received by it from the "lease" of the business. The shares and/or the assets of the corporation were pledged by the petitioner as security for, and as the sole source of payment of, the purchase price by petitioner. Petitioner thus had no personal liability for the unpaid purchase price. Simul-

---

[2] Petitioner, in years prior to those before the Court, had acquired, and subsequently sold, several other businesses in this type of transaction.

taneously with, or immediately after, the acquisition of the shares, the corporation was completely liquidated and all of its assets transferred to petitioner. Petitioner then transferred the current assets of the business to certain persons in exchange for an interest-bearing promissory note and entered into what was described as a lease agreement covering the physical and other assets, including tradenames, goodwill, etc. Under that agreement, petitioner was to receive as "rent," 80 percent of the net profits of the business; sometimes provision was made for a downward reduction in this percentage at a later date. The owners of the leases were usually different from those who previously owned the shares of the corporation, such previous owners holding at most minority interests. Some 21 of such transactions are involved herein covering a wide variety of businesses. The bulk of petitioner's income was derived from the "rents" it received.[3] The economic effect of these devices was to divide the net profits of each business: 20 percent to the operators, 8 percent to petitioner, and 72 percent to the sellers, with the operators claiming a deduction for the rentals as business expenses, the sellers reporting their profit on the sale as capital gains, and the petitioner claiming exemptions from tax as a charitable organization on the amounts received by it.

Respondent's principal challenges in the past, in his more than 15-year litigating activities involving purchase-and-lease transactions by entities claiming exemption as charitable organizations under the Internal Revenue Code, have been directed against the private parties involved through challenges to the capital gains treatment to the seller of the gain from the "sale" and to the deductibility of the "rent" by the lessee.[4] This time, respondent has challenged the claimed exemption and, alternatively, the status of the "rent" as "unrelated business taxable income." Respondent's position is that the statutory language reflects the intention of Congress to proscribe, or at least limit, the tax-free fruits of the type of purchase-and-lease transactions involved herein and that, by engaging in such transactions, petitioner has wandered from the Elysian fields of tax exemption into the everyday world of taxable business profits. Petitioner vigorously counters with the assertion that its activities clearly fit the statutory language and that to

---

[3] Not all of the petitioner's income was derived from purchase-and-lease transactions. It also received income from real estate holdings and other nonoperating investments.

[4] The leading case is *Commissioner* v. *Clay Brown*, 380 U.S. 563 (1965). Many of the parties to the purchase-and-lease transactions with petitioner have been the targets of largely unsuccessful challenges on the part of respondent:

(a) Capital gain of sellers: *Union Bank* v. *United States*, 285 F. 2d 126 (Ct. Cl. 1961); *Royal Farms Dairy Co.*, 40 T.C. 172 (1963); *Anderson Dairy, Inc.*, 39 T.C. 1027 (1963); *Estate of Sol Goldenberg*, T.C. Memo. 1964-134; *Oscar C. Stahl*, T.C. Memo. 1963-201; *Isis Windows, Inc.*, T.C. Memo. 1963-176; *Ralph M. Singer*, T.C. Memo. 1963-158.

(b) Rent deduction by lessees: *Warren Brekke*, 40 T.C. 789 (1963); *Royal Farms Dairy Co.*, supra; *Anderson Dairy, Inc.*, supra; *Estate of Sol Goldenberg*, supra; *Oscar C. Stahl*, supra; *Isis Windows, Inc.*, supra.

accede to respondent's blandishments would, therefore, be an unwarranted intrusion into the legislative arena. In essence, we are called upon herein to chart a course on the sea of judicial interpretation which will avoid the reefs of judicial legislation. Under the circumstances, the task is made even more difficult by the fact that, in many of its aspects, this case is one of first impression.[5]

There are two primary questions which require decision. The first is whether, during the 14-year period involved, petitioner was entitled to exemption as a charitable organization under sections 101(6) and 501(c)(3) of the 1939 and 1954 Codes, respectively.[6] Intertwined with this question is the further question of the impact of the "feeder" provisions of section 101 of the 1939 Code (added by section 301(b) of the Revenue Act of 1950 (Pub. L. No. 814, 81st Cong., 2d Sess.)) and contained in section 502 of the 1954 Code.[7] The second question is what part, if any, of petitioner's income constitutes "unrelated business taxable income" within the meaning of section 422(a) of the 1939 Code (added by section 301(a) of the Revenue Act of 1950, *supra*) and contained in section 512(a) and (b) (3) of the 1954 Code.[8] Common to both questions is the issue of whether, under the Internal Revenue Code, the payments received by petitioner from the "lease" transactions were "rents" or "rental" and, if so, whether they constituted rent

---

[5] The question of the exemption of the purchaser-lessor institution has been adverted to, but not decided, in *Commissioner* v. *Clay Brown*, 380 U.S. 563, (1965) (concurring opinion of Mr. Justice Harlan) ; *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, 64 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958) ; cf. *Royal Farms Dairy Co.*, 40 T.C. 172, 188 (1963).

[6] Since, insofar as this case is concerned, there are no differences between the applicable provisions of the Internal Revenue Code of 1939 and of the Internal Revenue Code of 1954, all references will be to the 1954 Code sections, unless otherwise indicated.

Sec. 101(6), I.R.C. 1939, and 501(c)(3), I.R.C. 1954, provide:

The following organizations shall be exempt from taxation under this chapter—

\* \* \* \* \* \* \*

Corporations \* \* \* organized and operated exclusively for religious, charitable, \* \* \* or educational purposes \* \* \* no part of the net earnings of which inures to the benefit of any private shareholder or individual, \* \* \*

[7] SEC. 502. FEEDER ORGANIZATIONS.

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation. For purposes of this section, the term "trade or business" shall not include the rental by an organization of its real property (including personal property leased with the real property).

[8] SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.

(a) DEFINITION.—The term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the exceptions, additions, and limitations provided in subsection (b). \* \* \*

(b) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations applicable in determining unrelated business taxable income are the following:

\* \* \* \* \* \* \*

(3) There shall be excluded all rents from real property (including personal property leased with the real property), and all deductions directly connected with such rents.

from "real property (including personal property leased with real property)".[9]

Special treatment of charitable organizations first appeared in the Corporate Excise Act of 1909, which exempted from its application—

any corporation or association organized and operated exclusively for religious, charitable, or educational purposes, no part of the net income of which inures to the benefit of any private stockholder or individual. [36 Stat. 113 (1909).]

At an early stage, the courts began to exhibit a generous attitude toward exempt organizations. The "exemption of income devoted to charity" was considered a "liberalization of the law in the taxpayer's favor * * * begotten from motives of public policy, and * * * not to be narrowly construed." See *Helvering* v. *Bliss*, 293 U.S. 144 (1934). This benevolent dispensation is clearly reflected in the "destination of income" cases, in which not only were organizations, directly carrying on concededly charitable activities, held to be exempt on income derived from commercial activities, but organizations engaged exclusively in business activities were also accorded immunity. *Trinidad* v. *Sagrada Order De Predicadores*, 263 U.S. 578 (1924); *Roche's Beach, Inc.* v. *Commissioner*, 96 F. 2d 776 (C.A. 2, 1938); *C. F. Mueller Co.* v. *Commissioner*, 190 F. 2d 120 (C.A. 3, 1951).[10] It has retained its vitality for over 40 years. *Lederer* v. *Stockton*, 260 U.S. 3 (1922); *Erie Endowment* v. *United States*, 316 F. 2d 151, 152 (C.A. 3, 1963); *Estate of Philip A. Carroll*, 38 T.C. 868, 873–874 (1962); cf. G.C.M. 21610, 1939–2 C.B. 103.

It was against the foregoing background that legislative interest in restricting the exemption of commercial activities of charitable organizations developed. As early as 1942, the Treasury Department voiced concern over commercial operations carried on directly by such organizations and suggested that they be taxed on the income derived from a trade or business "not necessarily incident to their exempt activities." See Hearings before the House Committee on Ways and Means on the Revenue Revision of 1942, 77th Cong., 2d Sess., p. 89 (1942). Neither the legislative committees nor Congress itself took any action at that time, but in 1943 what is now section 6033 was added to the 1939 Code and required charitable organizations to file information

---

[9] Although originally an issue herein, respondent has expressly renounced any claim that petitioner should be denied an exemption because it unreasonably accumulated income during any of the years at issue within the meaning of sec. 3814 of the 1939 Code or sec. 504 of the 1954 Code. Similarly, if the leases otherwise meet the requirements of the statute, respondent makes no claim that any of them constituted supplement U leases under sec. 423 of the 1939 Code or business leases under sec. 514 of the 1954 Code.

[10] Some courts, and particularly this Court, did not agree that such immunity should be accorded the latter type of organization. Compare *United States* v. *Community Services, Inc.*, 189 F. 2d 421 (C.A. 4, 1951), and the cases cited therein; *C. F. Mueller Co.*, 14 T.C. 922, revd. 190 F. 2d 120 (C.A. 3, 1951); *Joseph B. Eastman Corporation*, 16 T.C. 1502 (1951); *Donor Realty Corporation*, 17 T.C. 899 (1951).

returns.[11] In 1945 and 1947, two reports were issued dealing with the problem but making no recommendations. See Tax Exempt Organizations, Preliminary Report to the Joint Committee on Internal Revenue Taxation (Dec. 15, 1945); Reports of the Special Tax Study Committee to the House Ways and Means Committee, Revenue Revision 1947–48, p. 15 (Nov. 4, 1947). The latter referred specifically to hearings about to be held by the Committee on Ways and Means. In the course of those hearings, there was considerable testimony respecting the activities of exempt organizations, with the bulk (almost 200 pages) focused upon commercial operations directly carried on by those organizations and transactions involving the purchase and lease of business real estate. See Hearings before the House Committee on Ways and Means on Revenue Revisions, 1947–48, 80th Cong., 1st Sess., pp. 3395–3553 (1947).[12] Again Congress took no action but the stage was set for the enactment 2 years later of the amendments to the 1939 Code (later reenacted as part of the 1954 Code) applicable to the instant case.

At the time the Revenue Act of 1950 (Pub. L. No. 814, 81st Cong., 2d Sess. (1950)), was under consideration, both the House Ways and Means Committee and the Senate Finance Committee heard considerable testimony (including that of presidents and other representatives of numerous colleges and universities) with respect to such commercial activities. See Hearings before the House Committee on Ways and Means, 81st Cong., 2d Sess., pp. 18–19, 114–117, 165–171, 494–595, 781–813, 2530, 2531, 2612–2615, 2630, 2633, 2635, 2743 (1950); Hearings before Senate Committee on Finance, 81st Cong., 2d Sess., pp. 6–7, 216–218, 381–386, 506–519, 525–595, 656–662, 675, 791, 847, 849–853 (1950). The attention of the Congress was focused on the charge that, by engaging in such commercial activities or by being the sole shareholders of ordinary corporations engaged in such activities, exempt organizations were trading on their exemption and thus unfairly competing with non-tax-exempt business concerns. Much of the testimony was directed to purchase-lease transactions primarily in respect of activities of exempt organizations in acquiring and leasing industrial and commercial real estate such as hotel, apartment, factory, and retail store buildings. Detailed provisions dealing with the taxation of exempt organizations and related problems were included in H.R. 8920, introduced on June 22, 1950, and were the subject of extensive discussion and analysis in the respective committee reports. H. Rept. No. 2319, 81st Cong., 2d Sess., pp. 36–44, 107–132 (1950); S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 26–39, 104–126 (1950);

[11] See also, Hearings before the House Committee on Ways and Means on Revenue Revision of 1943, 78th Cong., 1st Sess., pp. 217, 228 (1943).

[12] See also Hearings before Senate Finance Committee, 80th Cong., 1st Sess., p. 466 (1946).

II. Rept. No. 3124, 81st Cong., 2d Sess., pp. 32–37 (1950). The statutory provisions which emerged were directed toward four main areas of concern—(1) the elimination of the ability to claim exemption, solely under the "destination of income" test, of corporations primarily and directly engaged in commercial activities, (2) the misuse of exempt organizations to effect certain self-dealing or "prohibited" transactions, (3) unreasonable accumulations of income by exempt organizations, and (4) the taxability of exempt organizations which, in addition to carrying on clearly exempt activities, themselves engaged directly in commercial activities, including the receipt of income from certain types of business leases involving terms of more than 5 years. In their totality, the provisions (including those with which we are concerned herein) occupied almost 14 pages of the enactment and contained numerous sections, subsections, paragraphs, and subparagraphs. They were pointedly specific. The discussion and analysis in the committee reports, as well as the debate on the House and Senate floors,[13] reveal legislative concern with the problem of unfair business competition on the part of exempt organizations and the need to avoid undue impairment of the fund-raising activities of those organizations. By specifying some, but not complete, tax responsibility on the part of exempt organizations in the area of business activity, the enacted provisions clearly exhibit the sensitivity of the Congress to the critical importance of steering a careful course in order to achieve the twin objectives set forth in the President's message requesting the legislation, as follows:

> Some of the loopholes have also been developed through the abuse of the tax exemption accorded educational and charitable organizations. It has properly been the *policy of the Federal Government* since the beginning of the income tax *to encourage the development of these organizations. That policy should not be changed.* But the *few glaring abuses* of the tax exemption privilege *should be stopped.* [Emphasis supplied. See H. Doc. No. 451, 81st Cong., 2d Sess., p. (1950)]

Consideration of the problems to which the provisions of the Revenue Act of 1950 were directed did not end with its enactment. Section 359 of the Revenue Act of 1951 (Pub. L. No. 183, 82d Cong., 1st Sess. (1951)) was added by the Senate as an amendment to section 421(b) of the 1939 Code in order to include, within the scope of the tax on unrelated business income, the commercial activities of universities and colleges of States and other governmental units. A further provision, which appeared in both the House and Senate versions, amended section 101 of the 1939 Code to relieve certain educational "feeder" corporations from taxes for years prior to 1951. See H. Rept. No. 586,

---

[13] See 96 Cong. Rec. pp. 9274, 9364, 9384–9385, 13273–13275, 15516, 15587, 15589 (1950). A comprehensive review of the legislative history of the pertinent provisions is contained in 2 Seidman, Legislative History of the Federal Income Tax, 1953–1939, pp. 2330–2386 (1954).

82d Cong., 1st Sess., pp. 35, 138 (1951); S. Rept. No. 781, 82d Cong., 1st Sess., p. 29 (1951). Provisions were added on the floor of the Senate dealing with publishing and other business activities of educational organizations (see H.R. 4473, 82d Cong., 1st Sess., secs. 348 and 349 (Sept. 28 (legislative day Sept. 19), 1951) which were adopted in part and rejected in part by the conference committee. See H. Rept. No. 1213, 82d Cong., 1st Sess., pp. 25, 87.

The next chapter in the legislative saga came with the enactment of the 1954 Code. The objective of this legislative exercise was a complete revision and updating of the internal revenue laws. Numberless problems were considered at great length. However, aside from a technical reorganization of the provisions dealing with the exemption of charitable organizations and their taxability with respect to income derived from commercial activities, relatively little attention was given to the problems generated by the Revenue Act of 1950. Changes were considered and adopted only in the area of renewals of business leases. See H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 51, A170–171 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 57, 311–314 (1954); H. Rept. No. 2543, 83d Cong., 2d Sess., p. 46 (1954).

From 1954 until recently, the legislative situation remained quiescent except for a variety of changes not directed at the problems which engage us herein.[14] But in late 1962, and again in 1963, renewed evidence of concern over the activities of exempt organizations was reflected in two reports entitled "Tax Exempt Foundations and Charitable Trusts: Their Impact on our Economy," published by the Select Committee on Small Business of the House of Representatives. Also in 1963, the Treasury Department proposed a change in the law, designed among other things to meet the purchase-and-lease situation, so to accord ordinary-income treatment on sales of capital assets against payments which were dependent upon income and were to be made

---

[14] In September 1954, the Internal Revenue Service through Rev. Rul. 54–420, 1954–2 C.B. 128, announced various bases upon which tax liability would be asserted. This ruling and the purchase-and-lease transactions generally have been the subject of widespread comment. The principal pre-*Clay Brown* commentaries are set forth in 380 U.S. at 566 fn. 2. Examples of post-*Clay Brown* commentaries are:

"Bootstrap Acquisitions: The Next Battle," 51 Iowa L. Rev. 992 (1966).

Kinsey, "Bootstraps and Capital Gain—A Participant's View of Commissioner *v.* Brown," 64 Mich. L. Rev. 581 (1966).

Nicharot, "Objective: Tax Avoidance; Clay Brown and The Three Party Sale and Leaseback," 2 Vill. L. Rev. 563 (1966).

Note, "The Macaroni Monoply: The Developing Concept of Unrelated Business Income of Exempt Organizations," 81 Harv. L. Rev. 1280 (1968).

Note, "Tax Problems of Bootstrap Sales to Exempt Foundations: A Comprehensive Approach," 18 Stanford L. Rev. 1148 (1966).

Note, "Capital Gain Treatment Afforded Proceeds of Sale in a Charitable Sale and Lease-back—Commissioner *v.* Brown, 380 U.S. 563 (1965)," 34 Geo. Wash. L. Rev. 360 (1965).

Note, "A Charitable Armageddon: Commissioner *v.* Clay B. Brown," 13 U.C.L.A. L. Rev. 167 (1965).

Note, "Seller's Proceeds of 'Bootstrap Sale' to Tax-Exempt Organization Held Taxable at Capital Gains Rates," 34 Ford. L. Rev. 358 (1965).

over a period of more than 5 years. Congress did not adopt the proposal, responding instead with the "imputed interest" provisions of section 483, also requested by the Treasury Department. See Hearings before the House Committee on Ways and Means on the President's 1963 Tax Message, 88th Cong., 1st Sess., pp. 154–156 (1963) ; H. Rept. No. 749, 88th Cong., 1st Sess., p. 72 (1963) ; S. Rept. No. 830, 88th Cong., 2d Sess., p. 103 (1963). And in early 1965, additional fuel was added to the fire with the publication of Treasury Department Report on Private Foundations. See Committee Print, Senate Finance Committee, 89th Cong., 1st Sess., Feb. 2, 1965.[15] This report and the decision of the Supreme Court in *Commissioner* v. *Clay Brown*, 380 U.S. 563 (1965), resulted in the introduction in the 89th Congress, 2d Sess., of H.R. 15942 and 15943 which were identical bills designed to impose a tax on the unrelated debt-financed income of tax-exempt organizations. Hearings on these bills were held on August 29, 1966, by the Committee on Ways and Means of the House of Representatives but to date no further legislative action has taken place.[16] Both the 1963 and 1965 recommendations of the Treasury Department sought to deal with the problem of purchase-and-lease transactions in a manner quite different from respondent's approach herein.

We have elaborated on the long and troublesome legislative and judicial history involved in this case, because we think it provides an essential backdrop for our decision. Cf., e.g., *Flora* v. *United States*, 357 U.S. 63 (1958), affirmed on rehearing 362 U.S. 145 (1960) ; *Helvering* v. *Morgan's Inc.*, 293 U.S. 121 (1934) ; *Burnet* v. *Harmel*, 278 U.S. 103 (1932). That history shows that the 1950 legislative action was couched in narrow specific terms, not in broad general language which leaves considerable room for judicial flexibility. It also shows that subsequent attempts to obtain further remedial legislation, and such legislation as resulted, were designed to attack the problem of the purchase and lease from other directions than that encompassed in the present assault by respondent. It is in this context that we turn to a consideration of the specific sections involved herein and the arguments of the parties.

The basic exemption of a charitable organization is conferred by section 501(c)(3) which requires that the organization be "organized and operated exclusively" for exempt purposes. There is no question that petitioner meets the "organized" requirement. The "operated" test presents a more difficult problem.

---

[15] See particularly pp. 30–37 of the report and example 3 on p. 30, which seems to be the precise situation of petitioner herein. The report generated a host of written statements which have been published as two volumes of committee prints by the House Committee on Ways and Means of the House.

[16] The bills were reintroduced as H.R. 12663 and H.R. 12664, 90th Cong., 1st Sess. (1967).

Respondent makes some veiled references to the fact that various friends and relatives of petitioner's sponsors participated in the profits of some of the operating concerns and appears to claim that, under section 503(c)(3), and regardless of our decision on the other elements involved, this would deprive petitioner of its right to exemption.[17] As far as the record shows, however, these persons made the same proportionate investment (albeit sometimes nominal in absolute amount) in the operating concerns as the unrelated persons and there was no discrimination in their favor with respect to their share in the earnings of these concerns. If they had not participated, the amount of the "rent" remitted to the petitioner (80 percent of net profits) would not have been changed one iota; in the absence of their participation, the nonrelated persons would simply have received a greater share of the earnings. Under these circumstances, we cannot say that any part, much less a "substantial part of the net earnings" *of petitioner* inured "to the benefit of any private shareholder or individual" so as to bring that proscription of section 501(c)(3) into play.

As our findings of fact show, practically all of petitioner's income was disbursed to Loyola University, a concededly exempt institution.[18] Prior to the Revenue Act of 1950, if the organization distributed its income exclusively for charitable purposes, it was entitled to exemption under the judicially established "destination of income" rule (p. 562, *supra*) even though its primary or indeed sole activity consisted of carrying on active business operations. Thus, if it were not for the Revenue Act of 1950, petitioner would be in the clear. The enactment of section 301(b) of that Act (now section 502) constructed a new roadblock along petitioner's path to exemption. That section provides:

SEC. 502.   FEEDER ORGANIZATIONS.

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation. For purposes of this section, the term "trade or business" shall not include the rental by an organization of its real property (including personal property leased with the real property).

Respondent asserts that petitioner actively carried on the trade or business of the operating companies by virtue of its continuing control and participation in those companies after the assets were "leased." We disagree. Petitioner's activities, for the most part, were conducted

---

[17] Respondent has made no claim that the amount of the annuities which petitioner agreed to pay was unreasonable in relation to the value of the property received in exchange therefor nor that the amount paid to J. P. Carroll Co. was unreasonable in relation to the value of the office space or services received in exchange therefor.

[18] The only other distribution was to Loyola High School, also a concededly exempt institution.

by Father Malone and Paul Cote, neither of whom appears to have had any experience with or knowledge of the type of businesses involved or, for that matter, with the operations of businesses generally. It is highly unlikely that they could have contributed much to the success of the businesses if they had attempted to participate in the day-to-day management. The evidence is clear, and we have so found, that petitioner did not itself, or through any of its officers or representatives, take part in the day-to-day operations of the businesses. Nor does the fact that petitioner retained the rights of inspection, approval of "lease" assignments, and veto with respect to charging asset acquisitions against the "rent" payments due it, change our conclusion. These rights were not inconsistent with the simple objective of an owner of property in making certain that the value of his ownership and his right to receive the payments due him not be dissipated by a third party in possession. Certainly they should not be equated with active, direct participation in the carrying on of a business.

Respondent's principal thrust with regard to the question whether petitioner was carrying on a trade or business is reflected in his contention that the so-called lease arrangements were in reality not leases but joint ventures or principal-agent contracts.

Whether a joint venture or a principal and agent relationship exists is essentially a question of fact and we are, of course, not bound by the nomenclature used by the parties. Among the critical elements, involved in the determination are the existence of controls over the venture and a risk of loss in the taxpayer, both of which elements are lacking herein. Compare *Bauschard* v. *Commissioner*, 279 F. 2d 115 (C.A. 6, 1960), affirming 31 T.C. 910 (1959); *Haley* v. *Commissioner*, 203 F. 2d 815 (C.A. 5, 1963), reversing and remanding 16 T.C. 1509 (1951), *Walsh Construction Co.* v. *Church*, 247 F. Supp. 808 (S.D.N.Y. 1965), and *Beck Chemical Equipment Corporation* 27 T.C. 840 (1957), with *Fishback* v. *United States*, 215 F. Supp. 621 (D. S. Dak. 1963), *Hubert M. Luna*, 42 T.C. 1067 (1964), and *Wm. J. Lemp Brewing Co.*, 18 T.C. 586 (1952). We have already discussed our finding of fact that petitioner did not participate in the day-to-day operations of the leased businesses (see above) and, as will subsequently appear, we have concluded that the various rights retained by petitioner did not represent a degree of control abnormal to its status as lessor. Petitioner did share in expenses to a degree, since such expenses were charged against income in arriving at net profits and the "rent" paid to petitioner was a percentage participation of profits. This element is often one indication of a joint venture but standing alone it is not enough. This is particularly true where, as is the case herein, petitioner was not required to contribute to

losses. If losses occurred, petitioner simply did not collect any rent for the particular period.

When we turn to the so-called leases themselves, we find that the provisions, although sophisticated in many respects, are not so unusual in this day and age so as to require us to find that the "leases" are something other than what they purport to be.[19] In this connection we have adopted the approach of the parties and have posited our analysis in terms of the lease provisions generally rather than in terms of a piecemeal dissection of each lease separately.

The right of inspection of the premises and of the books and records is a normal attribute of a conventional lease, particularly a percentage lease. The same is true of the various specifications as to what items could and could not be charged to net profits and with respect to the approval of assignments and changes in the owners of the so-called leased businesses. In this connection, we note that respondent's contention that petitioner had the right to select the officers and operating personnel of the "lessees" is simply not supportable on the record before us. The provision which required the approval of petitioner before capital improvements could be charged against the payments due it is somewhat unusual, particularly against the background that, with rare exceptions, all such improvements, involved herein were in fact submitted to and received the approval of petitioner. On the other hand, we note that the impetus of decision as to the need for capital improvements came from the operators of the businesses; petitioner had merely an after-the-decision limited power of veto in terms of how the expenditure would be charged. Moreover, the nature and extent of these improvements were such as to indicate that they amounted to no more than what was needed to maintain the assets in up-to-date, good operating condition—i.e., replacement of worn out or obsolete equipment. Finally, we note that losses of 1 year were not carried over to reduce payments to petitioner in later years. Such a carryover would be an expected element of a joint venture or a principal-agent relationship. Under these circumstances, we are loath in this age of sophisticated leasing arrangements to disavow the lease character of the arrangements on the basis of these provisions. In their totality, their essential purpose and effect appears to have been simply to protect the petitioner's capital investments in the businesses and insure the continued flow of the payments due it.

In view of the foregoing, we disagree with respondent that the arrangements between petitioner and the operating concerns should be characterized as joint ventures or principal-agent agreements. Cf. *Myra Foundation* v. *United States*, 382 F. 2d 107 (C.A. 8, 1967);

---

[19] For a detailed analysis of various percentage lease provisions, see McMichael and O'Keefe, Leases—Percentage, Short and Long Term (5th ed.).

*Grandview Mines* v. *Commissioner*, 282 F. 2d 700 (C.A. 9, 1960), affirming 32 T.C. 759 (1959) ; *Boys Incorporated of America* v. *Campbell*, —— F. Supp. —— (N.D. Tex. 1966, 18 A.F.T.R. 2d 5200, 66–2 U.S.T.C. par. 9533) ; *Clyde G. Tatum*, 46 T.C. 736 (1966), affd. 400 F. 2d 242 (C.A. 5, 1968) ; *Webster Corporation*, 25 T.C. 55 (1955), affd. 240 F. 2d 164 (C.A. 2, 1957).[20]

But our inquiry is not ended. We still must determine whether petitioner's leasing activity was of such a character that petitioner should be held to be "operated for the primary purpose of carrying on a trade or business for profit" within the meaning of section 502. Petitioner argues that Congress had in mind, in enacting section 502, only those corporations which were actively engaged in direct commercial operations; that long-term leasing is not such an activity; and that, therefore, section 502 is generally inapplicable. Alternatively, petitioner contends that the transactions involved constituted leases of "real property (including personal property leased with real property)" and that, therefore, by virtue of the second sentence of section 502, that section is inoperative herein.

Since we agree with petitioner's alternative argument, there is no need for us to dwell upon its assertion that, since leasing activities gave rise to "passive" income such activities should not constitute "carrying on a trade or business for profit" within the meaning of section 502. Cf. *Cooper Tire & Rubber Co. Employees' Retirement Fund*, 36 T.C. 96 (1961), affd. 306 F. 2d 20 (C.A. 6, 1962), dealing with the question whether leasing of personal property can constitute a "trade or business * * * regularly carried on" within the meaning of section 512.

The second sentence of section 502 provides that "the term 'trade or business' shall not include the rental by an organization of its real property (including personal property leased with real property)." With the exception of a very few situations, noted below, every lease involved herein encompassed real property, in the classical sense. Respondent argues, however, that, in many, if not most, of the leases,

---

[20] We note that, with three exceptions, all of the decided cases involving transactions of the type involved herein have sustained in full the deduction as rent by the operating concern of the payments made by it to the exempt organization. See cases cited at fn. 4, *supra;* see also *Ryegate Paper Co.*, T.C. Memo. 1961–193. And in the three exceptions, where a portion of the rent was disallowed as a deduction, respondent confessed error on appeal long after the proceedings herein were instituted. See *Royal Farms Dairy Co., supra*, remanded pursuant to stipulation of dismissal (C.A. 9, 1965) ; *Warren Brekke, supra*, remanded pursuant to stipulation of the parties (C.A. 9, 1966) (see also joint report to this Court dated July 14, 1966) ; *Estate of Sol Goldenberg, supra*, remanded pursuant to stipulation of dismissal sub nom. *Golden West Rubber Products, Inc.* v. *Commissioner* (C.A. 9, 1965). Moreover, in the *Goldenberg* case, the joint venture argument was considered and specifically rejected by this Court. Respondent now states that his conclusion in the foregoing cases was erroneous. We realize, of course, that this should not and cannot be a determining factor. Nevertheless our adoption of respondent's theory, herein, would be inconsistent with the rationale, although not the actual holdings, of these prior decisions.

the real property constituted a very small percentage of the value of the total property (the percentages as derived by respondent ranged from 2.32 percent to 45.6 percent) and that Congress, in carving out the exception to section 502, had in mind only those situations, such as a hotel or an apartment building, where real property was the essential element of the lease, with the personal property being of only incidental significance. Concededly, Congress was concerned principally with protecting the right of exempt organizations to lease industrial and commercial real estate without tax consequences except with respect to certain leases extending over a period of more than 5 years. Secs. 512(b)(4) and 514; H. Rept. No. 2319, supra at 36–40, 108–115; S. Rept. No. 2375, supra at 26–33, 106–115. But this does not justify our reading into the language used a quantitative, statistical, or mathematical formula pursuant to which some leases of personal property with real property would be sheltered and others would be beyond the pale.

There is not the slightest indication that Congress intended that such an approach be used. If Congress had wanted to distinguish between various types of leases involving real property in the manner suggested by respondent, it would have been easy for it to have done so—for example, by indicating that the exclusion of leases of personal property would apply only if the real property was the "primary" or "principal" subject matter of the lease, or by providing some guidelines as to whether the exclusionary formula should be based upon cost, fair market value, depreciated value, or some other basis of valuation of the leased assets.

Indeed, the difficulties which inhere in the development of such a formula are highlighted by the realization that, in many cases, the real property, although small in terms of absolute relative values, may be the critical operational element. By way of contrast to these difficulties, the courts can readily deal with situations where the real property is so clearly insignificant as to require the conclusion that the lease was not in fact a lease of real property. Cf. *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956). Clearly the leases herein cannot be so categorized.

In view of the foregoing, we are not inclined to dissect, at respondent's behest, the parenthetical phrase "including personal property leased with real property." See note, "The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations," 81 Harv. L. Rev. 1280, 1284 (1968), and Report of the Committee on Exempt Organizations, 19 A.B.A. Tax Bull. 79, 82–84 (No. 4, 1966).

In summary, as far as section 502 is concerned, we think it clear that, whether or not petitioner was operated for the purpose of ac-

quiring and leasing businesses and, therefore, in a broad sense, might be said to have been "carrying on a trade or business for profit," the types of transactions in which it was engaged were within the exclusionary provisions of the second sentence of section 502. Such being the case, section 502 does not apply. Since there is no question that all of petitioner's income was destined for charitable purposes, petitioner is therefore exempt under section 501(c)(3).

Even though petitioner is exempt under section 501(c)(3), it may still be subject to tax on unrelated business taxable income. The extent to which it may be so subject depends upon whether petitioner derived income from "any unrelated trade or business * * * regularly carried on by it" (section 512(a)) and the applicability of section 512(b)(3), which excludes from "unrelated business taxable income" " * * * all rents from real property (including personal property leased with real property)."

Our discussion of the foregoing clause in connection with the applicability of section 502 is equally applicable here for the reasons previously expressed. We think the leasing activities of petitioner fell within the exception contained in section 512(b)(3). Certain of the leases, however, require separate comment.

(a) *Ver Halen Press.*—Petitioner concedes that the transaction did not involve real property but the fact of the matter is that petitioner realized no income from it, with the result that it produced no "unrelated business taxable income" within the meaning of section 512(a).

(b) *Anderson Dairy.*—While the record is not completely clear, it appears that, subsequent to the original lease transaction, the real property involved was no longer occupied by the operating concern. The operations were conducted on new premises constructed with funds provided by others than petitioner. The old premises were remodeled at petitioner's expense and rented by the original lessees. The rental derived therefrom continued to be treated as part of the net profits of the operating business, of which 80 percent was required to be paid to petitioner under the original lease. Under these circumstances, we think the transaction with petitioner continued to involve a lease of personal property with real property and accordingly fell within the exception of section 512(b)(3).

(c) *Sub Leases.*—As shown by our findings of fact, in a few instances the interest in real property acquired by petitioner was represented by a leasehold, and the transaction with the operating concern, as to that aspect, took the form of a sublease. At various times, respondent has suggested that a sublease was not "real property" within the meaning of the exception to section 512(b)(3) (or, for that matter, of the second sentence of section 502). Respondent has, however, not pressed this point. In any event, under the circumstances herein, we

think the test of "real property" was met. It is inconceivable to us that Congress could have intended this phrase to turn upon the niceties of conveyancing. Moreover, whatever may have been its early historical status, modern jurisprudence embraces "lease-hold" within the concept of realty. See 1 American Law of Property, sec. 3.11 (1952 ed.), 2 Powell, Real Property, sec. 221(2) (1966).

To respondent's suggestion that such a construction of the statutory phrase "real property" embodies a "peppercorn" approach which will open the floodgates of tax avoidance, there is a twofold answer: (1) The area of sham transactions furnishes the courts with ample opportunity to stem the flow substantially, if not entirely (cf. *Emanuel N. (Manny) Kolkey, supra*) and (2) it is always open to the Congress to provide more precise guidance if it so desires.

We are required herein to reconcile the tax consequences of purchase-and-lease transactions to an otherwise exempt organization with detailed statutory provisions which have been enacted gingerly [21] and have been most carefully drawn against a background of historical bias in favor of the charitable exemption which still survives with the luster of its public-service emblem untarnished. In *Commissioner* v. *Brown, supra*, the Supreme Court was required to reconcile the tax consequences to the seller in such transactions with the specific provisions of the Internal Revenue Code dealing with capital gains. The Supreme Court was concerned with the impact of an unusual construction of the word "sale" on other provisions of the Code where that word is used. In this case, although the use in the Code of the words "rents" and "lease" is perhaps not as frequent as that of the word "sale," a similar problem exists. See secs. 37(c)(1)(C), 61(a)(5), 543(a)(7), 1241, 1402(a)(1), 1441(b), 1442, 1443, 4052, 4216(d), and 4217. Cf. *Grandview Mines* v. *Commissioner, supra; Clyde G. Tatum, supra; Webster Corporation, supra*. Under all the circumstances herein, we are constrained to follow the lead of the Supreme Court, which expressed itself as follows (380 U.S. at 579):

> The problems involved in the purchase of a going business by a tax-exempt organization have been considered and dealt with by the Congress. Likewise, it has given its attention to various kinds of transactions involving the payment of the agreed purchase price for property from the future earnings of the property itself. In both situations it has responded, if at all, with precise provisions of narrow application. We consequently deem it wise to "leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications." *American Automobile Assn.* v. *United States*, 367 U.S. 687, 697.

Cf. *Estelle Morris Trusts*, 51 T.C. 20 (1968).

---

[21] The hesitancy with which Congress has acted in the general area of curtailing the exempt status of charitable organizations is further reflected in the manner in which the provisions against unreasonable accumulation of income came into being. See *Curt Teich Foundation*, 48 T.C. 963, 976 (1967), on appeal (C.A. 7, Dec. 28, 1967).

We hold that petitioner was exempt from tax by virtue of sections 501(c)(3) and 502 and that, with the exception of a small amount which petitioner concedes as taxable by virtue of section 514, it did not have any "unrelated business taxable income" within the meaning of section 512.[22]

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

DAWSON, *J.*, did not participate in the consideration or disposition of this case.

———

RAUM, *J.*, dissenting: Let there be no mistake about this case; it involves a tax avoidance scheme of massive proportions whereby large amounts of business income are accorded favored tax treatment merely because a comparatively minor portion thereof finds its way into the hands of a charitable institution. All too often in cases of this character, the argument in support of such schemes is accompanied by the suggestion that the remedy is one for Congress rather than in the courts, and the effort to apply an existing statute to the situation is pejoratively characterized as "judicial legislation." Well, in spite of the difficulties in formulating a comprehensive legislative solution to the problem, Congress *has* done something about it. Congress has already amended the statute (in 1950) by adding provisions relating to "feeder organizations." These new provisions have been incorporated in section 502 of the 1954 Code which provides:

SEC. 502. FEEDER ORGANIZATIONS.

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation. For purposes of this section, the term "trade or business" shall not include the rental by an organization of its real property (including personal property leased with the real property).

These provisions, fairly construed, cover the present case.

The continued activity of acquiring and leasing such a multiplicity of businesses as are involved herein itself constitutes "carrying on a trade or business," and the statute makes clear that exemption from tax does not result merely because all of petitioner's profits may be "payable to one or more [exempt] organizations * * * ". The statute adds, however, that the term "trade or business" shall not include "the rental by an organization of its real property (including personal

———

[22] In view of our holdings, we need not decide the extent to which petitioner would be exempt from the tax on "unrelated business taxable income" because its activities were carried on by persons who received no compensation for their services except for accountants' fees and fees of attorneys principally for services connected with the dispute involved herein. See sec. 513(a)(1). Nor need we decide the subsidiary issues involved herein relating to income adjustments arising out of gain on certain timber sales, abandonment losses, or accruals of rent.

property leased with the real property)." But these latter provisions were obviously intended to relate to the passive rental of real estate and related personal property, as pointed out more fully in Judge Sterrett's dissenting opinion herein. What we have here is the "leasing" of entire businesses, and, at least in the case of some of the "leases", there was no showing that the "rentals" received were in any way related to real estate or that the real estate played any significant part in the operation of the business. The "rentals" represented merely a share of the *net* profits derived from the active conduct of the leased enterprise as a whole without regard to any real estate that may have been included. Plainly, they were not intended as consideration for the use or occupancy of real estate.

Bearing in mind the general objective sought to be achieved by the statutory provisions in question, the amounts here in issue can hardly be characterized as rentals from real estate and related personal property. In my view, a fair reading of section 502 is dispositive of the case against petitioner,[1] and sound judicial administration is not enhanced by a restrictive and inhospitable interpretation of legislative language.

WITHEY, ATKINS, and IRWIN, *JJ.*, agree with this dissent.

---

STERRETT, *J.*, dissenting: I dissent from the holding of the majroity in this case and would hold that the amounts in question represent taxable income to the petitioner on the basis, in effect, that petitioner has not made a showing that the rental payments in question represent rent from "real property (including personal property leased with the real property)" as that phrase is used in section 502 of the Code.

The failure to make such a showing means that petitioner cannot rely on the exception in section 502 from the term "trade or business" for those organizations who rent their "real property, etc." Since I would hold that the petitioner was clearly engaged in a trade or business, *Cooper Tire & Rubber Co. Employees' Retirement Fund*, 36 T.C. 96 (1961), affd. 306 F. 2d 20 (C.A. 6, 1962), by reason of the magnitude of its leasing activities, section 502 would then prevent the petitioner from claiming exemption from tax by reason of the fact that its income is distributable to exempt organizations. As it has shown no reason other than the character of the recipients of its income distributions as a basis for exemption, petitioner would then lose its exempt status, thus rendering all its income taxable.

The view that the rental payments involved here qualify as rent from "real property (including personal property leased with the real

---

[1] If sec. 502 is applicable, petitioner is completely deprived of status as an exempt organization, and it becomes unnecessary to consider secs. 511–513 dealing with the imposition of tax on "unrelated business income" of organizations which are otherwise exempt.

property)" is obviously basic to the petitioner's claim for exemption and hence a few words of discussion on that point are in order.

The term "real property (including personal property leased with the real property)" also appears in section 512(b)(3) of the Code as an exclusion from "unrelated business taxable income." The predecessors to sections 502 and 512 were added to the 1939 Code by the Revenue Act of 1950 and bore the section Nos. 101 and 422(a)(3), respectively, of that Code. These sections were then carried over into the 1954 Code as sections 502 and 512. Since the words "real property, etc.," must be deemed to have the same meaning in each section, the legislative history of each section is pertinent and hence reference will be made to both.

Investment in real property has been a historical source of income for exempt organizations of all kinds along with dividends and interest. As the Senate Finance Committee put it in its report No. 2375 (p. 31), accompanying H.R. 8920, which on enactment became the Revenue Act of 1950: "Moreover, investment-producing income of these types have long been recognized as a proper source of revenue for educational and charitable organizations and trusts." Congressman Lynch had made a comparable statement on the floor of the House during the debate on H.R. 8920 when he stated: "The receipt of interest, dividends, and royalties does not constitute carrying on an active business. In general, the receipt of rent is also considered a proper activity for these organizations and is not taxed. Historically, the colleges and other exempt organizations have often invested their endowments in rental property—and the bill does not tax this." (96 Cong. Rec. 9366.)

The Treasury Department has long put its stamp of approval on the receipt of such income by exempt organizations. See Regs. 86, art. 101(6)–1, and successor regulations through Reg. 118.

Significant, though, was the constant grouping of rental income with dividends and interest. All represent passive income, the type of income that could be received without the recipient becoming engaged in a trade or business, as that term is normally understood.

It developed, however, as the majority opinion has noted, that the commercial activities of some exempt organizations increased and with that increase came a corollary complaint from competitive tax-paying businesses. The hearings referred to by the majority did in fact disclose the abuses and the need for corrective measures. Consequently, the Revenue Act of 1950 was enacted and one of its provisions (now denoted as section 502 of the 1954 Code) is here in question.

It is clear from the hearings, from the entire legislative history of the 1950 Act, that its purpose was to correct the excesses that had crept into the activities of charitable organizations and to return to

the status quo where passivity was the principal characteristic of an exempt organization's income. The Ways and Means Committee summarized its purpose on this score in reporting out favorably H.R. 9420 as follows:

The tax applied to unrelated business income does not apply to dividends, interest, royalties (including, of course, overriding royalties), rents (other than certain rents on property acquired with borrowed funds), and gains from sales of leased property. Your committee believes that such "passive" income should not be taxed where it is used for exempt purposes because investments producing incomes of these types have long been recognized as proper for educational and charitable organizations. [H. Rept. No. 2319, 81st Cong., 2d Sess., p. 38.]

Further illustrating the restriction which Congress sought to impose upon the receipt of income, insofar as rental income is concerned, is the following statement from the Senate Finance Committee in its report on the same bill:

(b) * * * The term "rents from real property" does not include income from the operation of a hotel but does include rents derived from a lease of the hotel itself. Similarly, income derived from the operation of a parking lot is not considered "rents from real property." Income received from a business of renting personal property is excluded under section 422(a)(3) only if the personal property is leased with real propery [S. Rept. No. 2375, 81st Cong., 2d Sess., p. 108.]

The illustrative restriction on the type of qualifying rent from real property is pertinent; Congress was intent on not granting exemption to the operator of property. What we have here is not even the mere operation of property, but in fact the carrying on of an extensive primary business of leasing a large number of varied active business enterprises in which real estate played (for all we know) but an incidental role. The fruits of that primary business surely are not within the contemplation of the term "rents from real property" as explained above in the Senate Finance Committee report.[1]

Relevant also in the above quotation is the reference made by the

---

[1] It is interesting to note that when Congress added sec. 856 to the Code, which permits prescribed real estate investment trusts to receive and distribute certain rental income, without paying a tax thereon at the trustee level, it was careful to insure that rents from the active conduct of a trade or business would not be accorded the favored "pass-through" treatment.

"Section 856(d) defines "rents from real property." Restrictions and limitations are provided in the definition to prevent income from active business operations from being included therein. This is designed to insure that active business income is not to be given "conduit" tax treatment * * *

\*  \*  \*  \*  \*  \*

"Furthermore, section 856(d)(1) excludes from the definition of "rents from real property" any amount derived from real property if the determination of such amounts depends in whole or in part on the income or profits derived by any person from such property. An exception is provided for amounts based on a fixed percentage or percentages of receipts or sales of the lessee (whether or not adjusted for such items as returned merchandise, or Federal, State, or local sales taxes). * * * [H. Rept. No. 2020, 86th Cong., 2d Sess., pp. 9, 10.]"

Rent from the leases here at issue would not qualify for sec. 856 treatment since it is based upon a percentage of net income.

578

Senate Finance Committee to the fact that rent from personal property is excluded only to the extent that the personal property is leased with real property. The leasing of personal property almost inevitably involves the lessor more actively in the rental business than the rental of real property does. Cf. *Cooper Tire & Rubber Co. Employees' Retirement Fund, supra.* The committee's language seems to make it perfectly clear that the committee intended to exempt rent from personal property only when such property was leased as a necessary incident of the real property. Had they intended to grant coequal exemption status it would have been perfectly simply for it to provide for an exemption for rental income "from real and personal property."

The petitioner here involved engaged in the renting of going businesses on an extensive scale. The going businesses were made up of an admixture of assets, real property, personal property, tangibles, intangibles, goodwill, etc. The rent payable was based upon a percentage of net income, thus subjecting its very receipt to the risks of the business, unlike the familar percentage lease based upon gross receipts. The petitioner made no satisfactory showing that the rent it received was attributable, at the very least, in any substantial degree to any real property included in the composite of assets of the leased enterprises, rather than to other assets. Indeed, the majority itself has found that "There was no correlation between the cost or value of the fixed assets acquired by the Foundation and the rentals paid by the lessees." I think petitioner should fail in its claim of exemption from the effects of section 502.

RAUM, WITHEY, ATKINS, and IRWIN, *JJ.*, agree with this dissent.